[No. D049605. Fourth Dist., Div. One. May 17, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
TOMAS IBARRA, Defendant and Appellant.

## COUNSEL

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Raquel M. Gonzalez and Angela M. Borzachillo, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BENKE, Acting P. J.**—Appellant in this case was the subject of a videotape recorded by a reality television show. The videotape was made as police successfully rescued appellant's estranged girlfriend from him during the course of appellant's attempt to strangle her at her place of employment. On appeal appellant argues his conviction of attempted first degree murder must be reversed because the trial court erred in permitting the prosecution to show the jury three minutes and fourteen seconds of the videotape in support of the prosecution's contention that the girlfriend was severely injured by appellant and in fact the subject of an attempted murder. In permitting the prosecution to use the videotape, the trial court acted well within its discretion. The videotape did not in any manner mischaracterize or distort the events it recorded and was probative evidence with respect to appellant's intent in holding his girlfriend hostage for more than 30 minutes with a belt tightly wrapped around her neck. The girlfriend and the officers testified that as police broke into the room where appellant had been holding the girlfriend, appellant intentionally pulled hard on the belt, and the girlfriend, who had been bleeding from her ears and nose, lost consciousness. The police also testified that they had to exert considerable force on appellant in order to get him to release the belt. The videotape corroborated this prosecution testimony because it disclosed the extreme level of force needed to rescue the girlfriend and her physical condition immediately upon being rescued. Its probative value in this respect far outweighed the potential its dramatic nature would mislead, distract or inflame the jury.

We also reject appellant's contention there was insufficient evidence he had a premeditated and deliberate plan to kill his girlfriend. In addition to a number of death threats appellant made over the course of their relationship, the jury's verdict was supported by the fact appellant came to his girlfriend's place of work in violation of a recent restraining order and at a time when she was alone. The premeditation and deliberation was also supported by the girlfriend's testimony that during the course of the assault, appellant told her

he was looking for something with which to cut her body into pieces and hide them, that he had been thinking about killing her and in fact had calculated how much prison time he would serve if he killed her.

Finally, we reject appellant's contention the trial court should have stayed sentencing on the jury's additional finding appellant was guilty of inflicting corporal injury on a spouse. The record fully supports the conclusion that although appellant intended to kill his girlfriend, before he did so he had the separate and distinct intention of humiliating her by subjecting her to a lengthy period of physical abuse and terror. In light of that record, the trial court could reasonably impose sentence on appellant's corporal punishment conviction as well as his attempted murder conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant Tomas Ibarra and Beatriz Gomez had a romantic relationship which lasted from 1992 until 2003 and produced two daughters. Because appellant was abusive, on May 5, 2003, Gomez attempted to leave the relationship. Appellant reacted by dragging Gomez by the hair to their car, beating her in the car and telling Gomez he was going to kill her. When Gomez jumped from the car, appellant chased her, beat her, dragged her back to the car, beat her again, ripped her clothing off her and sexually assaulted her. Gomez did not immediately report the attack, but when she was able she did report it and appellant was arrested. Gomez then obtained a restraining order which prevented appellant from having any contact with her.

Approximately 6:00 p.m. on the evening of June 25, 2003, appellant appeared at Gomez's place of employment, a medical imaging center in Indio. Apparently, Gomez was alone, completing paperwork. Gomez asked him to leave; appellant refused and told her he had been thinking about killing her and he calculated that if he went to jail he would be out in 20 years. Gomez tried to call 911 but appellant yanked the phone out of the jack. Appellant told her she had "fucked up" trying to make the call. Appellant then chased Gomez down a hallway to a break room and grabbed her by the hair. Gomez again tried to call 911 and appellant yanked the phone out of her hand.

Appellant again told Gomez she had "fucked up," that if he was going to go to jail it was going to be for a reason and that he was going to kill her. At this point during the assault, a telephone rang and Gomez answered it and summoned help. In response, appellant dragged Gomez by the hair to a bathroom and attempted to bind her hands. When that attempt failed, he took off his belt and wrapped it around her neck. Appellant told Gomez that he wanted her on a leash like a "bitch," that he was going to kill her and that she was going to die.

Appellant dragged Gomez from the bathroom to a kitchen area; and, as he looked through cabinets, appellant told Gomez he was looking for something to cut up her body and hide the parts. As appellant pulled harder on the belt, Gomez had difficulty breathing and lost feeling in her legs.

Appellant and Gomez then heard the voices of police officers who had arrived. Appellant told Gomez she was dead. Appellant put a table up against the kitchen door and put Gomez in front of himself so that if police burst into the kitchen Gomez would get hurt instead of him.

The officers were videotaped by a crew from a reality television program, *COPS*. By the time the police officers arrived, Gomez was having difficulty hearing and seeing, her legs and face were numb, blood vessels had popped all over her face and she was bleeding from her ears, nose and mouth. A police officer negotiated with appellant for more than 30 minutes in an attempt to obtain Gomez's safe release. Finally, the police decided they would have to forcibly rescue Gomez. The police forced open the door to the kitchen and attempted to rescue Gomez. When the police entered the kitchen, appellant pulled hard on the belt, Gomez heard a "click," felt her eyes "coming out [of her head]" and lost consciousness. The officer who was negotiating with appellant made eye contact with appellant and saw appellant's grip on the belt tighten and saw appellant pull harder on the belt. The officers had considerable difficulty getting appellant to let go of the belt and shot him with a Taser gun. Eventually, the officers were able to get the belt off of Gomez's neck and she dropped into the lap of one the officers, unconscious. The officers took Gomez out of the kitchen to paramedics outside the building who were able to revive her.

At trial, in addition to testimony from Gomez and the arresting officers, the prosecution presented three minutes and fourteen seconds of the videotape recorded by the *COPS* crew. The jury convicted appellant of attempted murder with deliberation and premeditation, assault with a deadly weapon, false imprisonment, making a criminal threat, inflicting corporal injury on a spouse and intimidating a victim. (Pen. Code, §§ 187, 664, 245 subd. (a)(1), 236, 422, 273.5 subd. (e), 136.1, subd. (c)(1).) The trial court sentenced appellant to an indeterminate term of seven years to life and a determinate term of eight years.

## ·DISCUSSION

### I

In his first and principal argument on appeal, appellant contends the trial court abused its discretion in permitting the prosecutor to play the three-minute fourteen-second video recording of the police rescuing Gomez. We find no abuse of discretion.

■ The admission of videotape evidence is governed by Evidence Code section 352. (See *People v. Sims* (1993) 5 Cal.4th 405, 452 [20 Cal.Rptr.2d 537, 853 P.2d 992].) The question the trial court must resolve is whether the prejudicial impact of the videotape outweighs its value in assisting the jury to understand and evaluate the other evidence presented in the case. (*Ibid.*; see also *People v. Price* (1991) 1 Cal.4th 324, 441 [3 Cal.Rptr.2d 106, 821 P.2d 610].) In *People v. Sims* the trial court permitted the prosecution to present a videotape of a murder scene. The videotape showed a deputy coroner removing the victim's body from a bathtub and removing a pillowcase from the victim's head; when the pillowcase was removed, the videotape revealed a gag in the victim's mouth. In finding the trial court acted within its discretion in permitting the prosecution to show the videotape to the jury, the court stated: "The videotape was relevant in depicting the position of the victim's body in the tub—gagged, a pillow case secured over the head, and arms and legs bound behind the back—supporting the prosecution's theory that defendant, contrary to the defense presented at the trial, had acted with malice and the intent to kill, and that the killing was deliberate and premeditated. The videotape also corroborated Officer Perkins's testimony describing the crime scene. That the videotape was in part cumulative of other photographic evidence did not mandate its exclusion. [Citation.]

"Defendant complains the videotape's depiction of the laborious process of removing the soaking wet body from the bathtub was irrelevant to any of the issues at the trial. The videotape, however, supported the prosecution's theory that the actions of defendant in handling the unwieldy body were laborious and therefore deliberate and purposeful. The circumstance that the body was less manageable when wet (or, as defendant asserts, after possible rigor mortis had set in) than at the time the victim was placed in the bathtub, was a matter that a reasonable juror would have recognized and considered in evaluating what was depicted in the videotape.

"Thus, the videotape could have assisted the jurors in understanding and evaluating the testimony presented to them, and the trial court did not abuse its discretion in determining that this exhibit had sufficient probative value to warrant its admission." (*People v. Sims, supra*, 5 Cal.4th at p. 452.)

However, the court in *People v. Sims* recognized that live action videotape presents risks which trial courts must recognize. "We observe, however, that in other circumstances, a videotape may present a far more graphic, gruesome, and potentially prejudicial depiction than static photographs and thus, under such circumstances, should be excluded from evidence." (*People v. Sims, supra*, 5 Cal.4th at p. 452.)

Here, appellant's principal defense at trial was that he acted out of a heat of passion and therefore was guilty of attempted voluntary manslaughter, rather than attempted premeditated and deliberate murder. As we have noted, in contrast Gomez testified appellant told her he had figured he could get out of jail in 20 years if he killed her and if he was going to go to jail it was going to be for a reason. In this context the videotape was highly probative. The videotape directly corroborated the testimony of the police officers and Gomez that, even after they had broken into the kitchen, they had to use a great deal of force to rescue Gomez, that she was unconscious and had been bleeding from her eyes, ears and mouth as a result of the pressure appellant had put on the belt. These events, in particular the force depicted in the videotape, Gomez's lack of consciousness and the blood on her face, were entirely inconsistent with appellant's contention he acted out of a sudden heat of passion. Instead, the videotape supported the prosecution theory that until the very moment he was forcefully restrained, appellant was intent upon causing Gomez's death.

The fact the force and violence of Gomez's rescue might have also been conveyed to the jury by way of testimony and still photographs did not bar the trial court from admitting the videotape. (*People v. Sims, supra*, 5 Cal.4th at p. 452.) As the court in *People v. Sims* recognized, videos have the potential of being more graphic than is necessary to assist a jury in resolving factual issues. Here, however, the most graphic portions of the video simply recorded officers carrying an unconscious and bloody Gomez out of the kitchen following the officers' struggle to release her. These aspects of the video were directly related to the testimony offered by Gomez and the police officers and were not unduly prejudicial.

The fact the videotape was recorded by a professional film crew did not make it any more or less prejudicial. The technical skill of the photographers is unrelated to the question of whether the events portrayed in the three-minute fourteen-second portion of the videotape shown to the jury were relevant to issues in the trial and helpful to the jury. As we have indicated, the events portrayed in the videotape were both relevant and helpful and not unduly inflammatory.

In sum, the trial court did not abuse its discretion in permitting the prosecution to show the videotape to the jury.

## II

Appellant also argues there was insufficient evidence his attempt to kill Gomez was premeditated and deliberate. We reject this contention.

■ When a criminal conviction is challenged on the ground there was insufficient evidence of the crime, we " 'must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738].) "Like first degree murder, attempted first degree murder requires a finding of premeditation and deliberation. '[T]he test on appeal is whether a rational trier of fact could have found premeditation and deliberation beyond a reasonable doubt based upon the evidence presented.' The three categories of evidence for a reviewing court to consider with respect to premeditation and deliberation are: (1) prior planning activity; (2) motive; and (3) the manner of killing. 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." [Citations.]' " (*People v. Villegas* (2001) 92 Cal.App.4th 1217, 1223–1224 [113 Cal.Rptr.2d 1], fns. omitted.)

Here, consideration of the three categories of evidence pertinent in determining premeditation and deliberation all support the jury's verdict. Although appellant was subject to a restraining order and had only recently been released from jail with respect to the May 5, 2003, assault, he nonetheless arrived at Gomez's place of employment at a time when no one else was present to either protect her or summon police. These circumstances alone demonstrate a great deal of planning. In the prior assault and in the statements appellant made to Gomez during the course of the June 25, 2003, assault, appellant amply expressed the jealousy that motivated him. Finally, the extended period of time during which appellant had his belt around Gomez's neck and appellant's final attempt to strangle her as the police struggled to release her show he acted with coldness, calculation and extreme determination. In short, the record amply supports appellant's conviction of attempted premeditated and deliberate murder.

## III

Finally, appellant argues that under Penal Code section 654 the trial court should have stayed sentencing on his conviction for infliction of corporal punishment on a spouse. Again, we find no error.

■ Where a defendant is guilty of similar and related crimes committed over a short period of time but nonetheless entertained multiple intents and purposes, sentencing may be imposed on each crime. (See *People v. Nubla* (1999) 74 Cal.App.4th 719, 730–731 [88 Cal.Rptr.2d 265].) Here, the trial court could easily find on this record that although appellant intended to kill Gomez, he also wanted to humiliate and torture her before killing her. Indeed, there is little other explanation for the fact he dragged her around her place of employment, first by the hair and then with a belt tied around her neck. Thus the trial court was not required to stay sentencing on appellant's corporal punishment conviction.

Judgment affirmed.

Huffman, J., and Irion, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 12, 2007, S153834.