Filed 9/12/13  P. v. Winter CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>   v.<br><br>JARED WINTER,<br><br>   Defendant and Appellant. | D062455<br><br><br><br>(Super. Ct. No. SCE309006) |

APPEAL from a judgment of the Superior Court of San Diego County, Allan J. Preckel, Judge.  Affirmed as modified with directions.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Bradley A. Weinreb and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

Jared Winter appeals from a judgment convicting him of offenses arising from his attack on his mother, including attempted murder, torture, mayhem, battery with serious

bodily injury, and assault by means of force likely to produce great bodily injury (aggravated assault). He raises the following contentions: (1) Battery with serious bodily injury and aggravated assault are lesser included offenses of mayhem; hence, he improperly sustained multiple convictions based on necessarily included offenses and the court erred in failing to instruct the jury on lesser included offenses; (2) there was insufficient evidence to support intent to torture; (3) his counsel provided ineffective representation by (a) failing to request instructions on the defense of voluntary intoxication, and (b) failing to move to suppress his postarrest statements on *Miranda*[1] grounds; and (4) the trial court was required to stay the sentence on the attempted murder count because his attempted murder and torture offenses involved the single objective of killing the victim.

The Attorney General concedes that battery with serious bodily injury is a lesser included offense of mayhem, and we accept this concession. Accordingly, we modify the judgment to strike the conviction of battery with serious bodily injury. We find no other reversible error, and affirm the judgment as modified.

FACTUAL AND PROCEDURAL BACKGROUND

On February 27, 2011, defendant, age 33, brutally attacked his 65-year-old mother (Melinda Winter) at their home. Defendant had lived with his mother most of his life; he was unemployed and his mother supported him. Melinda testified that on the morning of the attack, defendant asked her for money for gas and food from a "fast food" place. She

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

gave him her credit card and a $20 bill, and asked him to bring her the change.  At 9:30 a.m., when defendant was back at home, Melinda went to his bedroom where he was lying on his bed, and asked for her change.  Defendant, as if "his legs were flying towards" her, kicked Melinda in the center of her chest, saying, " 'I'll show you your change.' "

Melinda blacked out and as she was "coming to," she was bent over at defendant's bedroom doorway, feeling "really woozy."  Defendant flung her at the bedroom door, and her face hit the door.  She blacked out again, and when she regained consciousness, she was standing up and defendant was hitting her face with his fists.  She was trying to protect her face with her arms, and she was backing up in the direction of the front door to try to get away from him.  Defendant hit her repeatedly along the side of her head and on her eye, and also hit her arms and legs.

At one point when defendant punched her in the side of her body, she fell down and urinated.  He became even angrier and began to hit her harder, saying, " 'You pissed all over me."  At another point when she put up her hands to try to thwart the assault, defendant "got mad" and she felt "a searing pain on [her] little finger" as defendant bit it.  Defendant kept repeating, " 'die, bitch, die.' "

Upon another revival after blacking out, Melinda was lying by a pillar in the living room area.  Defendant was choking her with his hands around her neck, saying, " 'Die whore.  Die, bitch.' "  When she regained consciousness after again passing out, defendant was "lifting [her] head up and down against the pillar," saying " 'Die, bitch,

3

die,' " and " 'I'm going to show you.' " The back part of her head and her neck were hitting the pillar.

After blacking out and waking again, Melinda could hardly open her eyes. Defendant appeared angry because she had regained consciousness. He yelled, " 'I'll show you,' " and left the area. When he returned he had "something gold in his hand." As Melinda was lying on the floor, defendant repeatedly hit her with the gold object all over her body, including her face, arms, legs, and ribs.

At one point while Melinda was lying on the floor, defendant told her he was going to kill her. Every time she regained consciousness, defendant was "yelling at [her], getting mad" and he would start hitting her harder. He would say " 'die bitch, die,' and 'die, whore, die.' " She felt he was angry that she had not died yet.

Towards the end of the attack, defendant was lying or sitting on top of Melinda with something covering her face, and she was suffocating and could not breathe. He was continuing to say, " 'die.' " Melinda managed to turn her head a little and get some air. She "just wanted to have it all end" and decided to pretend to be dead so he would stop hitting her. She let the blood run out of her mouth and lay as still as she could. Defendant got off her, and she heard him moving around. She passed out, and when she awoke she heard the voice of her neighbor, Carolyn Smith. Melinda felt pain "all over"; "every part of [her] hurt"; and she could not see. She passed out again, and when she awoke she was in the hospital.

Meanwhile, at about 10:00 a.m. that morning, defendant went to the home of the neighbors, Rodgers and Carolyn Smith. Defendant had blood on his face, arms, and

4

hands, and he told Rodgers his mother had tried to kill him. Rodgers told Carolyn to call 911, and Rodgers went with defendant and sat on Rodgers's front lawn. Rodgers testified defendant was agitated; he would repeatedly flop on his back and then sit up, and he was moving his arms around. When Rodgers asked defendant if he was taking medication or was on drugs, defendant responded no; however, defendant told Rodgers that he had " 'consumed a lot of alcohol.' " After Carolyn called the police, she want to check on Melinda, and then alerted her husband that Melinda had been severely beaten.

When the police arrived, defendant was lying on his back on Rodgers's front lawn. An officer smelled alcohol on his breath. Defendant had blood on both hands; two small cuts; and a swollen right hand. When he was being booked into jail, the nurse asked him if he had any injuries. Defendant told her his hand "kind of hurt." When the nurse asked him what happened to his hand, he answered, " 'I beat the shit out of a dummy doll.' " A police officer made a comment to defendant that it looked like he was trying to kill his mother. Defendant nodded his head affirmatively and said " 'I can't believe she's still alive.' " While searching defendant's room, the police found two empty vodka bottles under his mattress and nitrous oxide cartridges.

At the scene of the attack, Melinda was semiconscious, bleeding, and her face was so swollen she could not open her eyes. She suffered severe facial injuries and bruising and swelling all over her body. She had a laceration on her little finger "that went almost to the bone."

Two days after the attack while she was in intensive care, her eyes were still swollen shut; she was wearing a neck brace; she was in a lot of pain; and it was difficult

5

for her to speak. A bone in her jaw was broken, which made her unable to open her jaw to eat and caused hearing loss from swelling in her ear. About five days after the attack, she was able to see again, but her vision was impaired; for example, she would see five objects instead of one. About two months after the attack, she saw her face for the first time as she passed a mirror while being pushed in a wheelchair. Her face looked "huge"; all "puffed up high" and "everything was all black and blue." Her teeth were shattered; one tooth broke off at the gum line; and a bone in her mouth was cracked. Her examining physician determined she had sustained bleeding of the brain; numerous fractures (including to her right eye area, her left ribs, her sternum, and her backbone area); a two-centimeter bite laceration on her little finger; and swelling and bruising of the scalp.

Melinda was in the hospital for about two months, including in a rehabilitation unit where she received physical therapy and used a walker. When she returned home, for about two or three months she had a hospital bed and a portable toilet next to her bed; she needed assistance to stand; and family or friends stayed with her 24 hours a day.

By the time of trial almost one and one-half years later, Melinda still felt pain upon awakening; had bruising on her shinbone; had hearing loss; and had to wear glasses with prism lenses to correct double vision. Due to the attack, she lost two inches in her height and could not sit for lengthy periods of time without back pain.

*Jury Verdict and Sentence*

The jury found defendant guilty of attempted murder, torture, mayhem, elder abuse, battery with infliction of serious bodily injury, assault by means of force likely to

produce great bodily injury, and making a criminal threat.  It also found true allegations that he personally inflicted great bodily injury.

The trial court sentenced defendant to an indeterminate life term for the torture conviction, plus a determinate 12-year sentence (consisting of nine years for the attempted murder conviction and three years for the accompanying personal infliction of great bodily injury enhancement).[2]  The sentences for the remaining counts were stayed.

DISCUSSION

I.  <em>Lesser Included Offenses</em>

Defendant argues that battery with infliction of serious bodily injury and assault by means of force likely to produce great bodily injury are lesser included offenses of mayhem.  Accordingly, he contends (1) he could not properly be convicted of the battery and assault counts, and (2) the trial court had a sua sponte duty to instruct the jury that these were necessarily included offenses.[3]

A.  <em>Multiple Conviction Bar</em>

A defendant may not receive multiple convictions for a single act or course of conduct based on necessarily included offenses.  (*People v. Reed* (2006) 38 Cal.4th 1224, 1227; *People v. Sanders* (2012) 55 Cal.4th 731, 736.)  A lesser offense is necessarily included within a greater offense if the greater offense cannot be committed without also

---

[2]    The trial court struck the personal infliction of great bodily injury enhancement accompanying the torture count.

[3]    The terms "lesser included offense" and "necessarily included offense" are used interchangeably.  (*People v. Sloan* (2007) 42 Cal.4th 110, 115, fn. 2.)

7

committing the lesser offense. (*People v. Reed, supra*, at p. 1227.) When determining whether a defendant may sustain multiple convictions based on multiple charged offenses, we apply the elements test. (*Id.* at pp. 1229-1231.) Under the elements test, an offense is necessarily included in another offense if all the elements of the lesser offense are included in the elements of the greater offense, so that the greater offense cannot be committed without also necessarily committing the lesser offense. (*People v. Moon* (2005) 37 Cal.4th 1, 25.)

The elements of mayhem include (1) an act of physical force, (2) resulting in an injury which causes a body part to be lost, disabled, disfigured, or rendered useless, and (3) done maliciously, that is, with an intent to vex, annoy, or injure. (Pen. Code,[4] § 203; *People v. Santana* (2013) 56 Cal.4th 999, 1003, 1007; *People v. Ausbie* (2004) 123 Cal.App.4th 855, 861.) Battery consists of an unlawful use of force to touch a person, and the slightest touching suffices to establish the offense. (§ 242; *People v. Marshall* (1997) 15 Cal.4th 1, 38; *People v. Colantuono* (1994) 7 Cal.4th 206, 214, fn. 4.) The Attorney General concedes that battery with serious bodily injury is a lesser included offense of mayhem. We accept this concession. (*People v. Ausbie, supra*, 123 Cal.App.4th at pp. 859, 860, fn. 2; see *People v. Picklesimer* (2010) 48 Cal.4th 330, 341-

---

[4]     Subsequent unspecified statutory references are to the Penal Code.

342 [court accepts People's concession without deciding issue].)[5]

However, a defendant who commits mayhem has not necessarily committed assault by means of force likely to cause great bodily injury (aggravated assault). Assault occurs when the defendant initiates force likely to result in an unlawful touching, and aggravated assault occurs when the force used is likely to produce great bodily injury. (§ 245, subd. (a)(4); *People v. Colantuono, supra*, 7 Cal.4th at pp. 216-217 & fn. 7; *People v. Yeats* (1977) 66 Cal.App.3d 874, 878.) Unlike aggravated assault, mayhem does *not* require force likely to cause great bodily injury; that is, the offense is not defined by the degree of force but by the nature of the injury. (*People v. Ausbie, supra*, 123 Cal.App.4th at p. 861.) For the offense of mayhem, a defendant might "maliciously—that is, with an intent to vex, annoy, or injure another—use force less than that likely to produce great bodily injury but nonetheless produce a disfiguring result. Though the disfiguring result would be considered great bodily injury [citation], the act that produced it would not constitute an assault by means of force likely to produce great

---

[5] The multiple conviction bar applies when the defendant is convicted of multiple necessarily included offenses *for the same act or course of conduct*. (*People v. Sanders, supra*, 55 Cal.4th at p. 736; *People v. Greer* (1947) 30 Cal.2d 589, 600-601.) The prosecution did not premise the mayhem and battery counts on distinct acts or courses of conduct; accordingly, we assume the counts involved a single course of conduct.

We note that in *People v. Santana, supra*, 56 Cal.4th 999, the California Supreme Court recently held that serious bodily injury is *not* a separate element of mayhem that needs to be instructed upon and separately proven. (*Id*. at pp. 1009-1011, & fn. 5.) However, *Santana* did not evaluate whether mayhem and battery with serious bodily injury are necessarily included offenses; accordingly, this decision does not preclude us from accepting the Attorney General's concession.

bodily injury." (*Id*. at p. 862.) Thus, a defendant who commits mayhem has not necessarily committed aggravated assault.

To support his position that the commission of mayhem necessarily constitutes the commission of aggravated assault, defendant cites *People v. De Angelis* (1979) 97 Cal.App.3d 837. The *De Angelis* court held: "An assault is necessarily included in mayhem where the assault is a continuing event and the mayhem results during the course thereof." (*Id*. at p. 841.) *De Angelis*'s holding applies to the offense of *simple assault*, which is committed upon the use of force likely to cause the slightest touching, not to the offense of aggravated assault, which requires force likely to produce great bodily injury. (*People v. Ausbie, supra*, 123 Cal.App.4th at p. 860 & fn. 2; *People v. Quintero* (2006) 135 Cal.App.4th 1152, 1169.) *De Angelis* does not support defendant's position.

Defendant was properly convicted of mayhem and assault by means of force likely to produce great bodily injury.

### B. *Sua Sponte Duty To Instruct on Lesser Included Offenses*

Defendant argues his mayhem conviction must be reversed because the trial court did not instruct the jury that battery with serious bodily injury and assault by means of force likely to cause great bodily injury are lesser included offenses of mayhem. Based on our holding that aggravated assault is not a lesser included offense of mayhem under

10

the elements test, we address this contention only with respect to the battery with serious bodily injury offense.[6]

A trial court has a sua sponte duty to instruct on *uncharged* lesser included offenses if there is substantial evidence the defendant is guilty only of the lesser offense. (*People v. Birks, supra*, 19 Cal.4th at p. 118.) The rule requiring instruction on uncharged lesser included offenses "prevents either party, whether by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other. Hence, the rule encourages a verdict, within the charge chosen by the prosecution, that is neither 'harsher [n]or more lenient than the evidence merits.' [Citation.]" (*Id.* at p. 119.) Here, defendant's complaint concerns the failure to instruct on a *charged* lesser included offense, not an uncharged one. Because the lesser included offense of battery with serious bodily injury was presented to the jury as a verdict option in a separate count, there was no concern that the jury was not provided with the range of verdict options warranted by the evidence.

However, to the extent the charges included necessarily included offenses, we agree with defendant that the trial court was required to instruct the jury that it could not convict him of both a greater and lesser included offense. (See CALCRIM Nos. 3516,

---

6       Defendant does not assert that the accusatory pleading test, in addition to the elements test, should be used to determine the instructional duty for, as here, *charged* necessarily included offenses. (See *People v. Reed, supra*, 38 Cal.4th at pp. 1229-1231 [accusatory pleading test appropriate to determine whether there has been *notice* of *uncharged* lesser included offense as alternative to charged greater offense]; *People v. Moon, supra*, 37 Cal.4th at pp. 25-26; *People v. Birks* (1998) 19 Cal.4th 108, 117.)

11

3519; see also *People v. Greer, supra*, 30 Cal.2d at pp. 598-599.)  Based on the Attorney General's concession that the battery count was a lesser included offense of the mayhem count for purposes of the multiple conviction bar, any instructional error in this regard is cured by our striking of the battery conviction from the judgment.  Additionally, this is not a case where the court was required to instruct the jury on how it should return its verdicts in the event it could not reach a verdict on the greater offense.  (See *People v. Fields* (1996) 13 Cal.4th 289, 309-310 [although jury may consider greater and lesser included offenses in any order, if jury deadlocks on greater offense, trial court must instruct that it cannot accept guilty verdict on lesser offense unless jury acquits on greater offense].)  Here, there was no deadlock on the mayhem offense and thus there was no need to instruct on this point.

Defendant argues the trial court's instructions were deficient because they did not include a "*Dewberry*" admonition that if the jury has a reasonable doubt as to whether the greater or lesser offense was committed, it must find the defendant guilty only of the lesser offense.  (*People v. Dewberry* (1959) 51 Cal.2d 548, 555.)  The courts have recognized that some type of instruction should be given that directs the jury "what to do if it has a reasonable doubt as to whether the defendant committed the greater or a lesser offense."  (*People v. Crone* (1997) 54 Cal.App.4th 71, 76-77; *People v. Barajas* (2004) 120 Cal.App.4th 787, 793.)  The instructions given here sufficed to convey the concept that the jury could convict only of the lesser offense if it had doubt concerning the greater offense.  Regarding the concept of proof beyond a reasonable doubt, the jury was told: "The defendant in a criminal case is presumed to be innocent.  This presumption requires

12

that the People prove the defendant guilty beyond a reasonable doubt. . . .  [¶] . . . [¶]
Unless the evidence proves the defendant guilty *of a charge* beyond a reasonable doubt,
he is entitled to an acquittal and you must find him not guilty."  (Italics added; see
CALCRIM No. 220.)  Also, the jury was instructed that it must consider each count
separately and return a separate verdict for each count:  "Each of the counts charged in
this case is a separate crime.  *You must consider each count separately and return a*
*separate verdict for each one*.  The defendant may be found guilty of none, some, or all
of the charged crimes."  (Italics added; see CALCRIM No. 3515.)

These instructions told the jury that (1) it must consider and return a verdict for
each count separately, and (2) if it has doubts about guilt on a charge, it must return a not
guilty verdict.  Following these instructions, the jury necessarily would have understood
that it must consider both the mayhem and battery counts, and if it had a doubt as to the
mayhem count, it could not return a guilty verdict for that count.

For the same reasons, even assuming arguendo the trial court was required to
explicitly instruct the jury that if it had a doubt that defendant committed the greater or
lesser offense it must find him guilty solely of the lesser, the error was harmless.  There is
no reasonable probability the jury thought it could convict defendant of both the mayhem
and battery counts even though it was not sure whether his acts constituted mayhem or
just battery with serious bodily injury. (See *People v. Crone, supra*, 54 Cal.App.4th at p.
78 [reasonable probability standard applies to instructional error concerning how to
handle necessarily included offenses].)  As stated, the jury was instructed that it must
evaluate each count separately and it could return a guilty verdict only if the charge was

13

proven beyond a reasonable doubt.  We presume the jury followed these instructions.  (*People v. Gray* (2005) 37 Cal.4th 168, 217.)  Based on the instructions provided to the jury, if any juror had reasonable doubt about the mayhem charge, the jury would not have returned a guilty verdict for this count.

There was no prejudice from the failure to instruct on necessarily included offenses.

## II.  *Sufficiency of Evidence of Torture*

Defendant argues the torture conviction must be reversed because the evidence does not show he intended to cause cruel or extreme pain and suffering for a sadistic purpose.  He asserts that although he brutally beat Melinda, his acts and words show he intended only to kill her, not torture her.

The offense of torture is committed when a person inflicts great bodily injury with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or any sadistic purpose.  (§ 206.)  The infliction of severe wounds does not necessarily prove an intent to torture because horrible wounds can reflect an intent to kill or a passionate explosion of violence rather than a sadistic intent to inflict suffering.  (*People v. Mungia* (2008) 44 Cal.4th 1101, 1137; *People v. Elliot* (2005) 37 Cal.4th 453, 467.)  However, a finding of *both* intent to torture and intent to kill may be supported by facts showing the defendant acted " 'with a "sadistic intent to cause the victim to suffer pain in addition to the pain of death." [Citation.]' " (*People v. Mungia, supra*, 44 Cal.4th at p. 1136.)  For example, an intent to torture may be inferred from

14

circumstances showing "the defendant deliberately inflicted nonfatal wounds or deliberately exposed the victim to prolonged suffering." (*Id*. at p. 1137.)

In reviewing a challenge to the sufficiency of the evidence, we consider the entire record in the light most favorable to the judgment to determine whether a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Elliot, supra*, 37 Cal.4th at p. 466.) Melinda testified that during the early stages of the attack, defendant repeatedly hit her in the face with his fists. At one point when she raised her hands in response to the assault, he bit her finger "almost to the bone," which caused her "searing pain." Also, when Melinda awoke after being unconscious, defendant told her he would " 'show' " her; he left the area and retrieved an object; and he then repeatedly hit her all over her body with the object. The jury could reasonably infer that defendant's beating of his mother's face, rather than confining his attack to areas of her body more susceptible to fatal wounds, indicated that he wanted her to suffer as well as die. Also, the jury could reasonably deduce that defendant bit her finger and hit her with the object to make her suffer because she was resisting the attack and not dying like he wanted her to. Further, defendant's act of leaving the area to retrieve the object supports that he engaged in calculated conduct reflecting a sadistic intent in addition to an intent to kill. These factual circumstances support the jury's finding that defendant had the intent to cause cruel or extreme pain and suffering for a sadistic purpose.

To support his challenge to the torture verdict, defendant cites the evidence showing that during the attack he repeatedly said he wanted his mother to die and he stopped attacking her when she pretended to be dead. These circumstances, which show

15

an intent to kill, do not refute the other circumstances described above that support that he also intended to make her suffer for a sadistic purpose.

### III. *Claims of Ineffective Assistance of Counsel*

Defendant argues his counsel provided ineffective representation because (1) he did not request instructions on voluntary intoxication to negate the required specific mental states for the charges, and (2) he did not move to suppress defendant's postarrest statements on *Miranda* grounds.

To show ineffective representation, the defendant must establish that counsel's performance fell below an objective standard of reasonableness, and that there is a reasonable probability that absent counsel's deficiency the result would have been different. (*People v. Weaver* (2001) 26 Cal.4th 876, 925.) A reasonable probability in this context means a reasonable chance, more than an abstract possibility. (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050-1051.) There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and we do not second-guess reasonable tactical decisions in the harsh light of hindsight. (*People v. Weaver, supra*, at pp. 925-926.) When the record on appeal does not reveal counsel's trial tactics, we will not find ineffective assistance "unless there could be no conceivable reason for counsel's acts or omissions." (*Id.* at p. 926.) The courts recognize that "'"[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. [Citation.]"'" (*People v. Wrest* (1992) 3 Cal.4th 1088, 1115.) Even debatable trial tactics do not constitute ineffective representation. (*People v. Weaver, supra*, 26 Cal.4th at p.

16

928.)  Further, if the record does not show prejudice from counsel's alleged deficiency, we may reject the claim without determining whether counsel's performance was deficient.  (*People v. Sapp* (2003) 31 Cal.4th 240, 263.)

### A.  *Failure To Request Instructions on Voluntary Intoxication*

Defendant argues his counsel provided ineffective representation by failing to request that the jury be instructed on the defense of voluntary intoxication to negate the specific intents or mental states required for the charges, including intent to kill and intent to torture.  He contends that because there was evidence that he was intoxicated, his counsel could not have had a reasonable, tactical reason for not requesting instruction on intoxication.

Evidence of voluntary intoxication may be used to show the defendant did not have the specific mental state required for commission of the crime.  (*People v. Horton* (1995) 11 Cal.4th 1068, 1118-1119.)  A defendant is entitled to an instruction on voluntary intoxication if there is evidence from which a reasonable jury could conclude the defendant's mental state was so impaired that he did not entertain the required criminal intent.  (*People v. Williams* (1997) 16 Cal.4th 635, 677-678; *People v. Marshall* (1996) 13 Cal.4th 799, 848.)  However, a mere showing of drug or alcohol consumption and some impairment, without any showing of effect on the defendant's state of mind, is not enough to require an intoxication instruction.  (*Marshall, supra*, at p. 848.)

In closing arguments to the jury, defense counsel conceded that defendant was trying to kill his mother because he was in a rage, but argued he did not intend to torture her.  Although defense counsel commented that defendant's " 'inexplicable . . . rage' "

17

may have been precipitated by drinking or the consumption of some other substance, defense counsel did not attempt to argue that defendant was so inebriated that he could not formulate any of the required specific intents or mental states. Rather, defense counsel urged the jury to reject the torture allegation because the evidence did not show beyond a reasonable doubt that defendant wanted to sadistically inflict pain, not just beat his mother to death.

Defense counsel's decision to concede intent to kill and dispute intent to torture was a reasonable tactical decision. There was overwhelming evidence that defendant intended to kill his mother based on the severity of the attack and his repeated statements reflecting this intent. Further, the maximum sentence on the second degree attempted murder charge, including the personal infliction of great bodily injury enhancement, was a determinate term of 12 years (§§ 664, subd. (a); 190, subd. (a); 12022.7, subd. (a)), whereas the sentence for the torture charge was an indeterminate life term (§§ 206.1). Defense counsel could reasonably elect to concede the readily-established attempted murder charge in the hopes that the jurors would be satisfied with this conviction and defendant would avoid the harsher punishment arising from a torture conviction. (See *People v. Mitcham* (1992) 1 Cal.4th 1027, 1060-1061.)

Once counsel elected to concede attempted murder, pursuit of a voluntary intoxication defense would have required counsel to try to convince the jury that although defendant's alcohol consumption did *not* prevent him from formulating intent to kill, it *did* prevent him from formulating intent to torture and the other specific intents or mental states required for the charges. Counsel could have reasonably concluded that this

18

approach might run contrary to the jurors' common sense and undermine counsel's attempt to garner credibility with the jurors by conceding the attempted murder charge.

Further, defense counsel could have assessed that a voluntary intoxication defense did not have much chance of succeeding, and thus it was not worth pursuing the defense at the risk of diminishing the viability of the strategy based on a concession of attempted murder. Although there was strong evidence that defendant had consumed alcohol, as shown by the officer who smelled alcohol on his breath at the scene and defendant's statement to the neighbor, there was little evidence that defendant's state of mind was so altered that he could not engage in the level of thinking required to formulate a specific intent such as intent to torture. To the contrary, defendant engaged in conduct reflecting that he knew what he was doing; i.e., he interrupted the attack on his mother to retrieve an object and then used the object to continue the attack. Also, he went to the neighbor's home and formulated a story that could reflect a conscious attempt to exonerate himself or diminish his culpability, i.e., saying his mother tried to kill him.

In addition to the trial evidence showing defendant's alcohol consumption, defendant cites a mental health report included in the appellate record which states defendant reported that he drank a pint of vodka the morning of the attack, and he sobered up the next day. The report states that a video recorded at the police station contains images in which defendant laughs inappropriately, apologizes for laughing, grimaces and shakes his head, and makes "some statements that make little sense." However, the report states that the officers felt defendant was "generally coherent." This information supports that defendant was under the influence of alcohol, but in light of the

19

evidence showing he engaged in purposeful and cognitively-aware conduct during and after the offense, defense counsel could reasonably conclude that, on balance, it did not support a strong intoxication defense.

Based on defense counsel's strategic decision to concede intent to kill and the dearth of evidence supporting that defendant did not formulate the required specific mental states, the record does not show that counsel could not have made a reasonable tactical decision to forego an intoxication defense. Alternatively, there is no reasonable probability the outcome would have been different given the strength of the evidence that defendant's alcohol consumption did not impair his mental functioning to a degree negating the required specific mental states.

B. *Failure To Move To Suppress Defendant's Non-*Mirandized *Statements*

Defendant argues his counsel provided ineffective representation by failing to move to suppress his postarrest statements to the jail nurse and to the police on grounds that he had not been provided with the *Miranda* admonitions.

1. *Statement to the Jail Nurse*

In a pretrial motion, defense counsel moved to suppress defendant's postarrest statements on *Miranda* grounds. At the pretrial hearing on the motion, the prosecutor said she only intended to introduce defendant's statement to the jail nurse that he was " 'punching a dummy doll' " when during booking the nurse asked him, apparently for treatment purposes, what happened to his hand. Defense counsel argued the statement should be excluded because the nurse's question invited him to make a statement relevant

20

to the case. The trial court denied the motion, ruling the evidence was admissible unless the defense could show the nurse was acting as an agent of the police.

Defendant's contention on appeal that he was provided ineffective representation with respect to his statement to the jail nurse is unavailing because defense counsel *did* move to exclude this statement.

To the extent defendant contends the trial court erred in denying his counsel's motion to exclude the evidence, there was no error. The prophylactic *Miranda* rule generally requires exclusion of statements made by a defendant while being subjected to custodial interrogation without provision of the *Miranda* warnings. (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 86.) However, under the booking exception to the *Miranda* rule, the authorities need not provide *Miranda* warnings prior to asking routine questions related to health or safety concerns that arise during the arrest or booking process. (*Id*. at p. 87; *People v. Williams* (2013) 56 Cal.4th 165, 174, 187-189 [*Miranda* not triggered by prison intake question about reason for defendant's request for protective custody]; *People v. Jones* (1979) 96 Cal.App.3d 820, 827-828 [*Miranda* not triggered by arrest question related to defendant's medical condition]; *People v. Gomez* (2011) 192 Cal.App.4th 609, 634-635 [*Miranda* not triggered by routine booking question about gang affiliation designed to ensure safety of jail placement].) The fact that information gathered from these routine questions turns out to be incriminating does not alone render the statements inadmissible. (*People v. Andreasen, supra*, 214 Cal.App.4th at p. 87.) However, a *Miranda* interrogation may emerge during routine exchanges if the authorities ask questions " ' "that are designed to elicit incriminatory admissions." '

21

[Citation.]" (*People v. Williams, supra*, 56 Cal.4th at pp. 187-188; *People v. Andreasen, supra*, 214 Cal.App.4th at p. 87.)

Here, one of the arresting officers (Jarred Slocum) testified at trial that when defendant was being booked into the county jail, the jail nurse asked him if he had any injuries. Defendant responded that his hand "kind of hurt." The nurse then asked, " 'What happened to your hand?' " Defendant responded, " 'I beat the shit out of a dummy doll.' " These circumstances show defendant made the statement during routine booking in response to a health-related question which was properly asked by the jail nurse and which was unrelated to the police investigatory function. Under the booking exception to *Miranda*, the court did not err in admitting the statement.

### 2. *Statement to Officer Slocum*

On cross-examination of Officer Slocum, defense counsel asked, "At some point in time, did my client . . . indicate to you some . . . surprise of the fact that his mom was still alive?" Officer Slocum answered, "Yes." Thereafter, on redirect examination, the prosecutor asked Officer Slocum to describe the context of defendant's indication of surprise "that his mom lived." Officer Slocum testified that when he returned from the scene of the crime to the police station, the officer who had brought defendant in for processing told Officer Slocum that defendant knew he was under arrest but defendant had not yet been told what the charges were. Without providing *Miranda* warnings, Officer Slocum then said to defendant, " 'Going through and talking with everyone at the scene, it looks like you were trying to kill your mom.' " Defendant "nodded his head 'yeah' " and said " 'I can't believe she's still alive.' "

22

By asking Officer Slocum about defendant's indication that he was surprised his mother was still alive, defense counsel opened the door to allow the prosecutor's questioning on redirect examination about the entire conversation. (*People v. Sakarias* (2000) 22 Cal.4th 596, 642-644 [defense introduction of testimony regarding non-*Mirandized* interview allowed prosecution to introduce entire interview].) Because defendant's responses were admissible on redirect examination regardless of any *Miranda* violation, defense counsel did not provide ineffective representation by failing to object to admission of this evidence. Further, defense counsel was not ineffective for introducing the evidence about defendant's postarrest surprise that his mother was still alive because it was consistent with the defense theory that defendant was focused on killing his mother and he was not thinking about torturing her.[7] This was a reasonable tactical approach.

### IV. *Failure To Stay Sentence on Attempted Murder Count*

Defendant argues the trial court was required to stay the sentence on the attempted murder count because he engaged in a single course of conduct that solely involved his intent to kill Melinda.

---

[7]     For example, in closing arguments defense counsel stated: "He's trying to kill his mother. He thought he had. . . . [¶] . . . [¶] . . . She pretended to be dead, and it saved her life. Why did it save her life? *Because all he wanted to do was terminate her life. . . .* [¶] *Even the officers said, 'Gee, he was, "She's alive? I thought I killed her."*. . . [¶] . . . [¶] . . . He could have tortured her for days if he wanted. [¶] Why didn't he? Well, I guess he just didn't think about it? . . . He's not torturing her. He is terminating her existence. That is his goal."

When a defendant is convicted of two offenses that are part of an indivisible course of conduct, the sentence for one of the offenses must be stayed. (§ 654, subd. (a); *People v. Deloza* (1998) 18 Cal.4th 585, 591-592.) This rule is designed to ensure that a defendant's punishment is commensurate with his or her culpability. (*People v. McCoy* (1992) 9 Cal.App.4th 1578, 1584.) Whether a transaction is divisible so as to allow multiple punishment depends on whether the defendant had an independent objective for each offense. (*Id.* at p. 1585.) If a defendant had multiple, independent criminal objectives, he may be punished for each statutory violation committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct. (*Ibid.*) Multiple distinct objectives may exist if the defendant simultaneously entertains more than one objective during the transaction. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1212; *People v. Ibarra* (2007) 151 Cal.App.4th 1145, 1153.)

On appeal we apply the substantial evidence standard to review the court's finding that the defendant had separate objectives. (*People v. Andra* (2007) 156 Cal.App.4th 638, 640.) We view the evidence in the light most favorable to the court's determination, and presume in support of the court's conclusion the existence of every fact that could reasonably be deduced from the evidence. (*Id.* at pp. 640-641.)

The trial court reasonably found that defendant had two distinct objectives, to kill his mother and to cause her to suffer pain in addition to the pain of death. As set forth above, defendant not only attacked his mother with a life-threatening brutal beating, but he also focused part of the attack on her face, bit her finger, and repeatedly hit her with an

24

object that he retrieved during the course of the attack. These circumstances support the court's finding of multiple objectives, warranting punishment for both attempted murder and torture.

## V. *Cumulative Error*

Defendant argues the cumulative effect of error in his case requires reversal of the judgment. We are striking his battery with serious bodily injury conviction so there is no error with respect to the multiple conviction bar for necessarily included offenses. Assuming arguendo there was error arising from the court's failure to instruct the jury to select only the lesser included offense in the event of doubt, and defense counsel's failure to request intoxication instructions, the errors, even considered cumulatively, did not deprive defendant of a fair trial. As set forth above, the instructions provided to the jurors clearly apprised them that each count (including the greater offense of mayhem) had to be proven beyond a reasonable doubt, and there was strong evidence that defendant's alcohol consumption did not impair his formulation of the required specific intents or mental states.

## DISPOSITION

The conviction for battery with serious bodily injury (§ 243, subd. (d), count 5) is stricken from the judgment. As so modified, the judgment is affirmed. The trial court is directed to amend the abstract of judgment to remove the battery with serious bodily

25

injury conviction, and to forward the amended abstract to the Department of Corrections and Rehabilitation.


HALLER, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.