Filed 4/16/21  P. v. Rivera CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CANDIDO RIVERA,<br><br>    Defendant and Appellant. | B299461<br><br>(Los Angeles County<br>Super. Ct. No. YA097491) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark S. Arnold, Judge.  Affirmed.

Doris M. LeRoy, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan S. Pithey, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted Candido Rivera of murder and on other charges stemming from a police chase and collision in which Rivera crashed a stolen vehicle into a utility pole, killing his passenger. Rivera argues the trial court erred in admitting footage from body cameras worn by two police officers depicting post-collision events. Rivera contends the footage was irrelevant, more prejudicial than probative, and cumulative of other evidence. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Information*

The information charged Rivera with second degree murder (Pen. Code,[1] § 187, subd. (a); count 1); fleeing a pursuing peace officer's motor vehicle causing death (Veh. Code, § 2800.3, subd. (b); count 2); assault on a peace officer (§ 245, subd. (c); count 3); driving or taking a vehicle without consent with a prior conviction (§ 666.5; Veh. Code, § 10851; count 4); misdemeanor hit-and-run driving resulting in property damage (Veh. Code, § 20002, subd. (a); count 5); and misdemeanor driving when privilege suspended or revoked (Veh. Code, § 14601.1, subd. (a); count 6). The information alleged that Rivera had served three prior prison terms within the meaning of section 667.5, subdivision (b). Rivera pleaded not guilty to the charges and denied the special allegations.[2]

---

[1]     All further statutory references are to the Penal Code, unless otherwise indicated.

[2]     Before trial Rivera pleaded no contest to the charges of driving or taking a vehicle without consent with a prior conviction (count 4) and driving when privilege suspended or revoked

B.    *The Prosecution Case*

On January 9, 2018 at approximately 10:30 a.m., Rivera drove past Gardena Police Officer Jaycon Sanchez in a silver Honda CR-V.  Sanchez, who was in uniform, ran the Honda's license plate and discovered the vehicle had been reported stolen on January 8, 2018 in South Gate.  Sanchez located the vehicle two blocks away traveling westbound on 168th Street.

As the Honda approached Sanchez's patrol car, Rivera waved at Sanchez and began to pull the Honda to the right curb. Sanchez activated his patrol car's emergency lights and drove forward to prevent Rivera from escaping.  Sanchez's patrol car had a dashboard camera, and Sanchez was wearing a body camera.

As Sanchez opened the patrol car's door, Rivera accelerated towards Sanchez's car, striking its door and closing it.  Sanchez remained in the patrol car and began to pursue Rivera.  At the intersection of Normandie Avenue and 166th Street, Rivera ran a red light and drove on the wrong side of the road.

When Rivera reached the intersection of Normandie Avenue and Marine Avenue, the Honda struck an occupied pickup truck. Rivera did not stop.

Rivera ran another red light.  At the intersection of Normandie Avenue and Rosecrans Avenue, Rivera drove on the wrong side of the road.

Rivera ran a red light at the intersection of Normandie Avenue and Century Boulevard.  Rivera swerved to avoid a

(count 6).  Rivera admitted the prior conviction allegations on count 4.

3

sheriff's vehicle.[3]  The Honda collided with another vehicle.  Rivera lost control of the Honda, and it crashed into a utility pole.  The Honda burst into flames.

The pursuit lasted approximately four minutes, and covered five to six miles.  Rivera ran six or seven red lights, and the vehicles reached speeds ranging between 70 and 110 miles per hour.

Sanchez's body camera captured Sanchez stating that the vehicle had "TCed Century and Imperial.  TC.[4]  Roll fire, it's on fire.  Roll fire, it's on fire."  Sanchez approached the burning Honda.  Rivera appeared to be alive.  Another officer observed that a person inside the Honda was "[s]till talking."  Sanchez and the other officer told Rivera to exit the vehicle.  Sanchez then shouted, "Get the female out!  Get the female out!"  Sanchez told the other officer that Rivera was the driver and that a passenger was still inside the car.

Gardena Police Officer Luis Villanueva approached the burning vehicle with a fire extinguisher.  Villanueva pulled Rivera, who was slumped over the passenger, out of the vehicle.  Villanueva attempted to pull the female passenger from the car, but the flames prevented him from extracting her.  The passenger died at the scene.

Gardena Police Detective Richard Reynaga spoke to Rivera at the hospital in an effort to identify the female passenger.  Reynaga wore a body camera when he spoke with Rivera.

---

[3]  The Los Angeles County Sheriff's Department assisted the Gardena Police Department by blocking traffic on Normandie Avenue and Century Boulevard.

[4]  "TC" refers to "traffic collision."

4

Reynaga told Rivera that he needed the passenger's name to do a "death notification." Rivera replied, "Jackie, that's all I know." Rivera told Reynaga that he had picked Jackie up at an abandoned house near Florence Avenue and Budlong Avenue. Rivera said the police could contact people who knew Jackie through Facebook, but that Rivera did not know Jackie's Facebook profile and had contacted her through "Messenger." Rivera stated that Jackie and he had been in Gardena "[c]ruising around." Rivera asked Reynaga if Jackie was "really bad;" Reynaga replied that she had "passed away in the crash."

Gardena Police Detective Karen Salas, who investigated the collision, inspected the Honda and found fingernail clippers in its ignition, indicating that the vehicle had been stolen.[5] Salas obtained city camera footage that had captured portions of the police chase. At least one camera showed Rivera driving the Honda on the wrong side of the road. Salas testified that the police ultimately identified the female passenger as Jacqueline Cortez.

The coroner testified that Cortez died from blunt force trauma from the collision. The coroner stated that it did not appear the fire contributed to Cortez's death because he found no evidence of significant smoke inhalation in Cortez's airways or lungs and the toxicological results were "essentially negative" for carbon monoxide. The coroner testified that Cortez's head injury was "devastating" and "incompatible with life." He testified Cortez's death would have been "very immediate," and that Cortez

---

[5] The parties stipulated that the Honda had been stolen on January 8, 2019 and that Rivera drove the stolen Honda without permission on January 9, 2019.

would have died "within a matter of seconds." Cortez was 21 years old.

C. *The Defense Case*

Gardena Police Officer Joel Martinez drove to Normandie Avenue and 162nd Street after being dispatched to join the pursuit of Rivera. Martinez saw Rivera and Sanchez approaching the intersection. Martinez joined the pursuit behind Sanchez's patrol car. Traffic conditions were "[l]ight to moderate," and the Honda was traveling 53 miles per hour.

At the intersection of Magnolia Avenue and Redondo Beach Boulevard, Martinez began to "call the pursuit," which meant that he spoke into his police radio and provided information about the direction of the pursuit, its speed, the traffic conditions, and any other observations, including red lights. At the intersection of Rosecrans Boulevard and Normandie Avenue, Rivera swerved to the right of a vehicle making a right turn; the Honda hit the right curb before continuing straight through the intersection. The traffic light at the intersection was green. At the intersection of Normandie Avenue and Marine Avenue, Rivera ran a red light. The Honda was traveling 80 miles per hour.

Rivera steered the Honda into opposing traffic; the Honda was traveling 90 miles per hour. Rivera drove the Honda into opposing traffic three times.

Just before Imperial Avenue, Martinez lost sight of the Honda. Martinez arrived at the scene of the collision and saw Rivera slumped over in the car. Martinez did not know whether Rivera was alive.

6

D.     *Sanchez's Body Camera Footage*

The prosecution sought to play two portions of footage from Sanchez's body camera.  The second portion, which runs two minutes nine seconds, depicts post-collision events at the scene, including officers using fire extinguishers on the burning vehicle, officers extracting Rivera from the vehicle, and officers stating that Cortez could not be extracted.  Cortez is not visible in the footage.

Defense counsel objected that the post-collision footage was irrelevant.  Defense counsel argued, "There's no issue about hitting the pole.  There's no issue about a fire."  The prosecutor responded that he had "the obligation and the right to prove up every element of each charge," including Cortez's cause of death.  The prosecutor argued the footage was "extremely relevant" to showing "who they were able to get out of the car, who they were not able to get out of the car.  What happened to the female."  Defense counsel asserted the footage was "very prejudicial" and the coroner could testify to Cortez's cause of death.  The trial court ruled that the footage was "circumstantial evidence of implied malice" and overruled the defense's objection.

As Sanchez testified, the prosecution played the footage for the jury.  Sanchez testified that at the scene he could feel the heat from the flames, which were "very hot" and "intense."  He stated, "I could feel my skin somewhat burning, or that feeling of my skin burning."  Sanchez testified that Villanueva and another officer pulled Rivera from the burning car, but that the officers could not extract Cortez because "it was just too hot, and the car . . . was fully engulfed."  He testified that his goal had been to try to save both Rivera and Cortez.

Following this testimony, the trial court summoned counsel to a sidebar. The court stated:

"All right. Additional relevance for the audio and the video is in addition to being circumstantial evidence of implied malice, [it] also portrays the heroic measures the officers took in rescuing the defendant. And also that there was really nothing they could do about the female victim."

E. *Villanueva's Body Camera Footage*

Villanueva testified after Sanchez. During his testimony, the prosecution played footage from Villanueva's body camera. Defense counsel did not object to the footage.

The footage runs eight minutes 29 seconds. The first four minutes 22 seconds shows Villanueva driving his patrol car during the pursuit of Rivera. The next one minute 30 seconds depicts Villanueva running to the burning vehicle, spraying a fire extinguisher, and extracting Rivera from the burning vehicle. It also depicts Villanueva and other officers realizing they cannot rescue Cortez. In the last two minutes 47 seconds of the footage Villanueva paces in the street as firefighters work to extinguish the fire; Villanueva can be heard cursing and expressing distress that he could not extract Cortez. Other officers are seen and heard consoling him. Cortez is not visible in the footage.

Villanueva testified that he approached the burning vehicle because "it's part of [his] job." He described the heat from the flames, and explained that the flames prevented him from extracting Cortez from the car.

The prosecutor asked Villanueva to confirm that he was "audibly upset" at the end of the footage. Villanueva testified that he was "absolutely" upset because:

8

> "[O]ur job is to save people. To see a young lady in
> there hit home. I have three daughters; one that's
> 32, one that's 27, and one that's 15. I'm a very
> strong, devoted Christian man—"

Defense counsel objected to this testimony and moved to strike it. The trial court struck the testimony "about being Christian." Villanueva testified that the "bottom line" was that he was upset because he was not able to save both Rivera and Cortez.

F.     *Defense Counsel's Objections to the People's Exhibits*

At the close of the People's case, the trial court asked defense counsel whether she had objections to any of the People's 11 trial exhibits.[6] Defense counsel stated that the prosecution sought to introduce nine post-collision vehicle photographs, when "one or two should suffice." Defense counsel also objected that the People sought to introduce "too many" photographs of Cortez, when one was "probably enough" or "two at most."

---

[6] The People's trial exhibits consist of a flash drive containing dashboard, body, and city camera footage (exhibit 1), four transcripts of audio from the footage (exhibits 1(a)-(d)), two photographs of Sanchez's Gardena police vehicle (exhibits 2 and 3), two photographs of damage to Sanchez's police vehicle (exhibit 3), three post-collision photographs of Cortez in the Honda (exhibit 4), one photograph of Rivera driving the Honda (exhibit 5), nine post-collision photographs of the Honda (exhibit 6), three photographs of the vehicle Rivera struck before hitting the utility pole (exhibit 7), one autopsy photograph of Cortez's head and neck (exhibit 8), one photograph of fingernail clippers in the Honda ignition (exhibit 9), Cortez's DMV record and photograph (exhibits 10(a) and (b)), and a copy of the parties' stipulation regarding Rivera's driving of the stolen Honda (exhibit 11).

9

Defense counsel further argued that "some" of the videos the People offered were "very lengthy and cumulative, over and over again. I just think it's way too many, so I would just object on those grounds." Defense counsel did not identify the specific videos to which she objected.

The trial court ruled that the post-collision vehicle photographs were not cumulative. The court also ruled:

> "I don't find that any of the exhibits that the People have marked are irrelevant. I don't find them—any of them where the prejudicial effect is outweighed by the probative value."

The trial court asked defense counsel whether she had any other objections to the 11 exhibits. Defense counsel responded, "No, Your Honor."

G.    *The Murder Jury Instructions*

After opening statements and again before closing arguments, the trial court instructed the jury with CALCRIM No. 520 (first or second degree murder with malice aforethought). The court instructed the jury that the People must prove that Rivera committed an act that caused the death of another person and that when he acted "he had the state of mind called malice aforethought." The court explained that "there are two kinds of malice aforethought, express malice and implied malice," and that "proof of either is sufficient to establish the state of mind required for murder." The court told the jury that express malice "doesn't apply here. No one is saying that [Rivera] intended to kill anybody."

The court instructed the jury on the elements of implied malice. The court stated:

10

"The defendant acted with implied malice if:

1.      He intentionally committed an act;
2.      The natural and probable consequences of the act were dangerous to human life;
3.      At the time he acted, he knew his act was dangerous to human life; and
4.      He deliberately acted with conscious disregard for human life."

The court further instructed the jury that malice aforethought "is a mental state that must be formed before the act that causes death is committed.  It does not require deliberation or the passage of any particular time."

H.      *The Prosecution's Rebuttal Closing Argument*

At the end of the rebuttal closing argument, the prosecutor stated:

"So I want to finish with a study in contrasts. Somebody who acts with regard for human life versus the defendant who acts without regard for human life.  Let's look at Detective Villanueva.  This case impacted him in a serious way."

The prosecutor then played Villanueva's body camera footage.  The prosecutor stated that Villanueva "was a hero in this case.  He saved the defendant's life and he put himself in harm's way."  The prosecutor noted that Villanueva grabbed a fire extinguisher and ran towards the burning Honda.  The prosecutor argued:

"And you heard about the searing heat, and you look at that car being fully engulfed and that could have exploded at any second.  That didn't stop him and Officer Sanchez and the Sheriff [*sic*] deputies there

11

from putting their lives on the line to save whoever [*sic*] they could inside that car.  It didn't matter to them that the defendant endangered their lives and ultimately killed Jacqueline, they wanted to save lives.  That is someone who has a regard for human life.  That is what regard for life looks like.

"The defendant is on the other end of that spectrum. He has no regard for life.  No regard for the life of a girl he just met who was only 21 years old.  No regard for the life of the Gardena police officers who were just trying to do their job.  He put them in harm's way. . . .  He didn't care about anyone other than himself.  That is why I said it is selfish and what he did was an act of cowardice.

"I want to end with this, the last four minutes of Jackie's life.  Just think about that when you are deliberating.  The horror, the terror, her last seconds on this earth were awful.  Do justice for Jackie."

I.     *The Verdict and Sentencing*

The jury found Rivera guilty of murder, fleeing a pursuing peace officer's motor vehicle causing death, assault on a peace officer, and hit and run driving resulting in property damage.

The trial court sentenced Rivera to an indeterminate term of 15 years to life for murder (count 1), four years (the middle term) for assault on a peace officer (count 3), and one year (one-third the middle term of three years) for driving or taking a vehicle without consent with a prior conviction (count 4).  The court imposed the middle term of six years for fleeing a pursuing peace officer's

motor vehicle causing death (count 2) and stayed that term pursuant to section 654.[7]

Rivera filed a timely appeal.

## DISCUSSION

### A.    *Applicable Law and Standard of Review*

"Only relevant evidence is admissible at trial.  [Citation.] Under Evidence Code section 210, relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'  A trial court has 'considerable discretion' in determining the relevance of evidence.  [Citation.]  Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects." (*People v. Merriman* (2014) 60 Cal.4th 1, 74; accord, *People v. Hardy* (2018) 5 Cal.5th 56, 87; see *People v. Duff* (2014) 58 Cal.4th 527, 558 [reviewing courts "afford trial courts wide discretion in assessing whether in a given case a particular piece of evidence is relevant and whether it is more prejudicial than probative"].)  "'Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt.'" (*People v. Valdez* (2012) 55 Cal.4th 82, 133.)

---

[7]    The trial court also sentenced Rivera to 180 days in county jail on each of the charges of hit-and-run driving resulting in property damage (count 5) and driving when privilege suspended or revoked (count 6).  Rivera's custody credits exceeded the imposed jail sentences.

13

"A trial court's ruling on the admission or exclusion of evidence is reviewed for abuse of discretion." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 131; accord, *People v. Cowan* (2010) 50 Cal.4th 401, 462.) "'A trial court's decision to admit or exclude evidence is a matter committed to its discretion "'and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'"'" (*People v. Masters* (2016) 62 Cal.4th 1019, 1056.)

B.     *Rivera Forfeited Any Objection to Villanueva's Body Camera Footage*

Rivera concedes his counsel did not object to the admission of Villanueva's body camera footage. Rivera therefore forfeited the issue. (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 ["challenges to the admission of evidence must be preserved for appellate review with a timely and specific objection at trial"]; *People v. Demetrulias* (2006) 39 Cal.4th 1, 19-20 ["[w]e conclude defendant forfeited the issue of the evidence's admission by his failure to make a timely objection on this ground"].)

Rivera contends that objection to Villanueva's body camera footage would have been futile because the trial court overruled defense counsel's objection to Sanchez's body camera footage and later ruled that none of the prosecution's exhibits was irrelevant or unduly prejudicial. Rivera's argument is not persuasive.

"The overruling of an objection to one item of evidence does not necessarily mean an objection to different evidence would have been futile." (*People v. Livingston* (2012) 53 Cal.4th 1145, 1160; accord, *People v. Williams* (2015) 61 Cal.4th 1244, 1285.) The Sanchez footage and the Villanueva footage are not identical. They contain similar post-collision scenes of the burning vehicle

14

and Villanueva's extraction of Rivera from the vehicle. The Villanueva footage also depicts Villanueva's reaction and conduct upon realizing he could not extract Cortez from the burning vehicle. Defense counsel could not reasonably have concluded that the trial court's overruling of the objection to the Sanchez footage necessarily rendered futile an objection to all or some of the Villanueva footage. Indeed, the trial court granted defense counsel's motion to strike Villanueva's testimony about his religious beliefs, which Villanueva offered as the prosecutor questioned him about the body camera footage. By failing to object to Villanueva's footage, Rivera forfeited his objection to the admission of the footage. Even if he had not forfeited the issue, however, the trial court did not abuse its discretion in admitting the footage, as we discuss below.

C. *The Trial Court Did Not Abuse Its Discretion in Admitting Sanchez's and Villanueva's Body Camera Footage*

Rivera argues that Sanchez's and Villanueva's body camera footage was irrelevant. Rivera also argues the trial court abused its discretion under Evidence Code section 352 in admitting the footage because it was "vastly more prejudicial than probative." Neither argument has merit.

The parties agreed that the murder charge required the People to prove that Rivera acted with implied malice. (See §§ 187, subd. (a), 188, 189.) "Implied malice has been judicially interpreted 'as having "both a physical and a mental component. The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' [Citation.] The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another

15

and . . . acts with a conscious disregard for life.""'" (*People v. Cruz* (2020) 46 Cal.App.5th 740, 751.)

The body camera footage was relevant to and probative on a primary issue at trial: whether Rivera acted with implied malice, including whether the natural and probable consequences of his reckless driving were dangerous to life. The severe damage to the vehicle from the force of the impact, the fire that immediately erupted, and the officers' difficulty in extinguishing the fire demonstrated the dangerousness of Rivera's driving and that death was likely to result from his driving. The trial court did not err in determining that the body camera footage was relevant to the murder charge.

The trial court also did not err in finding that the footage was not unduly prejudicial. To be sure, the footage is not easy to watch. But "'victim photographs and other graphic items of evidence in murder cases always are disturbing.'" (*People v. Heard* (2003) 31 Cal.4th 946, 976 (*Heard*); see *People v. Brooks* (2017) 3 Cal.5th 1, 55 ["any 'revulsion [objected-to photographs] induce is attributable to the acts done, not to the photographs'"].) That the body camera footage is "graphic and unpleasant to consider does not render the introduction of those images unduly prejudicial." (*Heard*, at p. 976; see *People v. Perez* (2018) 4 Cal.5th 421, 458 ["[e]ven if the photos were unsettling, the degree of prejudice did not outweigh the probative value enough to exceed the trial court's discretion"]; *People v. Ibarra* (2007) 151 Cal.App.4th 1145, 1151 [trial court did not err in admitting footage of police rescuing victim].) The footage accurately depicts the outcome of Rivera's reckless driving and, based upon our independent review of the footage, is not unduly provocative or sensationalistic. Any risk of undue prejudice did not substantially outweigh the strong probative value of the footage. (See *People v. Sanghera* (2016)

16

6 Cal.App.5th 365, 373 ["under [Evidence Code] section 352, the prejudicial effect or other counterweights must 'substantially outweigh[ ]' the probative value"].)

Rivera argues that the footage—"particularly Villanueva's body cam[era] footage"—created an inaccurate and prejudicial impression that Cortez died in the fire. He asserts that the jury viewed the body camera footage four days before the coroner testified that Cortez died of blunt force trauma from the collision, leaving the jury "to stew in these images for four days before the cause of death was revealed to them."

The jury viewed Sanchez's footage on Thursday and Villanueva's footage the following Monday, which was the next trial day. The coroner testified the same day the jury viewed Villanueva's footage and heard Villanueva's testimony. Thus, at most a few hours elapsed between the jury's viewing of Villanueva's footage and the coroner's testimony. The coroner testified that Cortez's head injury was "devastating" and "incompatible with life," that she would have died "within a matter of seconds," and that it did not appear the fire contributed to her death. In addition, the trial court instructed the jury before opening statements to "keep an open mind throughout the trial" and "not make up your mind about the verdict or any issue until after you have discussed the case with the other jurors during deliberations." Rivera's speculation that the jury might have temporarily believed that Cortez died in the fire does not support a conclusion that the body camera footage was unduly prejudicial.

Rivera also argues that Villanueva's footage provided the prosecutor a basis to compare Villanueva and Rivera in his rebuttal closing argument, which "arouse[d] the passions of the jurors and improperly sway[ed] them in their deliberations." As an initial matter, defense counsel did not object to the prosecutor's

17

argument. Rivera thus forfeited any challenge to the prosecutor's argument. (*People v. Hoyt* (2020) 8 Cal.5th 892, 944.) Furthermore, the prosecutor could have drawn the same comparison of Villanueva's and Rivera's conduct from the trial testimony about their respective actions. The prosecutor's rebuttal argument does not demonstrate that Villanueva's body camera footage was unduly prejudicial.[8]

D.    *Even if the Trial Court Erred in Admitting the Body Camera Footage, Any Error Was Harmless*

Even if we agreed with Rivera that the trial court erred in admitting the body camera footage, "we nonetheless would conclude that any error in admitting such evidence was harmless under the *Watson* standard." (*Heard*, *supra*, 31 Cal.4th at p. 978; see *People v. Watson* (1956) 46 Cal.2d 818, 836.) "'Under the *Watson* standard, the erroneous admission of a photograph warrants reversal of a conviction only if the appellate court concludes that it is reasonably probable the jury would have reached a different result had the photograph been excluded.'" (*Heard*, at p. 978.)

_____

[8]    Rivera also argues Sanchez's and Villanueva's post-collision footage was cumulative of other visual evidence. Rivera does not specifically identify the evidence he contends rendered the body camera footage cumulative. We conclude after reviewing the record, however, that the footage was not improperly cumulative of other post-collision visual evidence. In addition to Sanchez's and Villanueva's body camera footage, the People also introduced nine post-collision photographs of the Honda and three post-collision photographs of Cortez in the Honda. These images depict the vehicle from different sides and positions, and, in contrast to the body camera footage, all of these images depict the vehicle after the fire had been extinguished.

18

The People introduced extensive evidence of Rivera's high-speed, reckless driving in the stolen Honda.  Testimony and visual evidence demonstrated that, in an effort to evade police, Rivera drove between 70 and 110 miles per hour on city streets, ran numerous red lights, drove on the opposite side of the road, and collided with two vehicles.  After the second collision, Rivera lost control of the Honda and crashed into a utility pole, killing Cortez.  Given this strong evidence, even if the trial court had excluded the body camera footage, it is not reasonably probable the jury would have reached a different verdict on any of the charges.

## DISPOSITION

The judgment is affirmed.


McCORMICK, J.*

We concur:


SEGAL, Acting P. J.


FEUER, J.

---

\*     Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19