Filed 5/23/24  P. v. Lee CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D081084 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD291530) |
| BYRON LEE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Steven E. Stone, Judge.  Affirmed.

Janice R. Mazur, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Warren J. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Byron Lee of second degree murder (Pen. Code,[1] § 187, subd. (a)) and personally using a deadly and dangerous weapon (§ 12022, subd. (b)(1)) after a road rage incident that resulted in the stabbing and death of another driver, Yacoub Abdallah.  Believing Abdallah had hit his car and was attempting to flee, Lee followed Abdallah's car, parked next to him, and grabbed a folding knife from his center console.  Lee opened the blade of his knife and placed it in his left hand, walked up to Abdallah's car, and punched him in the face twice with his right hand.  Abdallah then got out of his car and the two engaged in a fistfight.  The knife remained in Lee's left hand throughout the fight, but he denied any intent to stab Abdallah.  Abdallah eventually pushed Lee to the ground, walked away from the fight, and got back into his car.  After Abdallah drove a few blocks, his girlfriend, who was with him at the time, realized he was bleeding from his chest.  Abdallah then lost consciousness and crashed the car.  He died a short time later at the hospital.  The cause of death was a stab wound to the heart.

Lee contends on appeal that the trial court abused its discretion in admitting (1) a nine-second video of Abdallah at lunch with his girlfriend hours before the incident, and (2) a video from the body-worn camera of a police officer responding to the scene that shows Abdallah dying as he lay in the street for approximately five minutes.  Lee also contends that the trial court prejudicially erred in modifying the jury instruction on excusable homicide due to accident.  Although we conclude the trial court erred in admitting the videos in question, we find the error harmless.  We further conclude that the court did not err in giving the modified jury instruction,

---

[1]     Undesignated statutory references are to the Penal Code.

and even if the instruction was in error, it was also harmless. We therefore affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Criminal Charges*

The People charged Lee with the murder of Abdallah in violation of section 187, subdivision (a). The felony complaint also alleged that Lee personally used a deadly and dangerous weapon (a knife) within the meaning of section 12022, subdivision (b)(1). The People later filed the operative amended information and again alleged that Lee violated sections 187, subdivision (a), and 12022, subdivision (b)(1).

B. *Motions in Limine*

Before trial, the People filed several motions in limine seeking to admit various photographic and video evidence. At issue on appeal are two videos: a cell phone video of Abdallah and his girlfriend, A.K., eating lunch a couple of hours before the incident; and a video from the body-worn camera of a responding police officer that shows Abdallah dying as he lies in the street.

The prosecutor argued that the video of the couple at lunch was relevant to demonstrate their demeanors and identities, and to show a lack of injuries to Abdallah's face during the lunch. She described the couple's demeanor as "in a happy state, that they're on vacation here in San Diego, they're enjoying themselves" and stated that she expected the defense to argue that Abdallah was aggressive during the incident. The defense opposed the motion, arguing that there was no dispute as to the victim's identity and no relevance to the video other than to elicit sympathy from the jury. Defense counsel also argued there was no dispute that the victim had no injuries prior to the incident, and the defense would stipulate to that fact. The court granted the People's motion to admit the video, finding that the

3

"evidence is relevant and admissible on 352 grounds to show size, demeanor, and lack of injuries." The court further noted that in its view, the video was "benign."

The People also sought to introduce a five-minute video taken from the body-worn camera of one of the police officers who first responded to the scene of the car crash. As described in the People's motion in limine, the video shows Abdallah "lying on the street suffering from various wounds, including a prominent stab wound to the chest." In the video, Abdallah is moaning and struggling to breathe. The People argued that the video was relevant to prove the cause and manner of death and show the demeanor and initial statements of A.K., allowing "the jury . . . to better understand what [A.K.] witnessed and endured the day of the crime as her boyfriend struggled to stay alive right in front of her."

At the motion in limine hearing, the prosecutor again argued the video was relevant to show the wounds on the victim's body and A.K.'s demeanor, particularly because A.K. could not recall everything that happened due to the trauma she went through that day. The prosecutor asserted that the entire video needed to be shown because "[A.K.] makes statements throughout where she's comforting [Abdallah]," and also because the People had to prove that A.K. "was not involved in this in any way, shape, or form either." Because the defense intended to impeach A.K. based on some of her inconsistent statements, her "interaction with [Abdallah in the video] helped show that she is nothing but a loving, comforting girlfriend and she's in a state of shock." The prosecutor further argued that there were "dozens of incised or slash-type wounds all over the victim's body," which would refute Lee's argument that this was an accident, and the video was relevant to show the "state of the stab wound and the blood on his body." Finally, she argued

4

that it was important for the medical examiner to know the state "[Abdallah] was in to opine potentially how long he could have survived after the stab took place[.]"

The defense opposed admission of the video, arguing that it had no probative value and was instead solely intended "to inflame the emotions of the jury." According to defense counsel, any possible probative value of the video "showing [Abdallah] essentially dying" and "show[ing] his last gasps" was outweighed by prejudice under Evidence Code section 352. Defense counsel further argued that evidence of Abdallah's wounds was already going to be presented to the jury via the autopsy photographs, and A.K.'s demeanor and memory lapses were not relevant to the prosecution's case in chief.

The trial court ruled that the probative value of the video was not substantially outweighed by the probability that its admission would create a danger of undue prejudice, and it therefore granted the People's motion to admit it. The court stated: "I acknowledge that the material is not pleasant, but that goes to the nature of these charges . . . . I understand better now having watched the video a second time the People's reasons for wanting to admit this to show the demeanor and what I would find to be the spontaneous statements of an important witness." The court further explained its ruling: "The People also have to show cause and manner of death. I believe this video goes directly to that. And also the video goes to prove that this was not an accident or not self-defense. It does so by showing to the Court at least the significance of the injuries." The court also found that the People were not offering the video to elicit the emotions of the jury and that it was "the best evidence."

C. *The Prosecution's Case*

Abdallah's girlfriend, A.K., who was with him on the day of the incident, testified first for the prosecution. On June 26, 2021, Abdallah and A.K. were on vacation in San Diego to celebrate making their relationship "official." A.K. said the couple had gone jet skiing that morning and then out to lunch. The prosecution then showed the jury a short cell phone video of Abdallah and A.K. at lunch that day. A.K. testified that the video shows her and Abdallah "happy and smiling, enjoying the weather" and said it was "[t]he happiest I've ever been." The couple then went to a hookah lounge in downtown San Diego for an hour before returning to their rental car to go skydiving.

According to A.K., after they left the hookah lounge in their car, Abdallah turned the wrong way onto a one-way street. Another car, driven by Lee, came down the street in the opposite direction heading towards them. The two cars almost collided but were able to avoid an accident, and Lee did a U-turn and began aggressively following Abdallah's and A.K.'s car. Lee was driving fast and close, tailgating the couple's car and seemingly trying to "knock" their car off the road.

When Abdallah stopped at a red light in the right-hand lane, Lee pulled up and parked next to him on the left. Abdallah's window was rolled down. Lee walked up to the driver's side window, spoke to Abdallah for four or five seconds, and then punched him in the face several times through the open window. A.K. testified that Abdallah remained calm until he got punched in the face. Abdallah then got out of the car and began punching Lee back. The two continued punching each other in the middle of the street. A.K. did not see anything in Lee's hand during the fistfight. At some point during the fight, A.K. threw one of her shoes at Lee.

6

Cell phone videos of the fight taken by witnesses were admitted as exhibits at trial. The videos show Abdallah and Lee engaged in a fistfight in the street for approximately 15 to 20 seconds. Abdallah punched Lee several times, while Lee swung at Abdallah at least once with his right hand but did not appear to hit him. At two points seen in the videos, Lee appears to put his left hand and arm up to block Abdallah. Eventually Abdallah pushed Lee down and walked back to his car.

Abdallah and A.K. then got back into their car. As they were driving away, he told her not to worry and that they would still go skydiving that afternoon as planned. A.K. noticed that Abdallah's shirt was full of blood and asked whether it was his or Lee's blood. As soon as Abdallah noticed he was bleeding, he lost consciousness, and the car crashed into a utility box and a pole.

Bystanders helped A.K. get Abdallah out of the car by taking him out through the passenger side door. They laid him onto the ground and applied pressure to his wound until the police and ambulance arrived. A San Diego police officer testified that when he arrived at the scene, he saw Abdallah lying on his back, gasping for air, and going in and out of consciousness. He also observed a one-inch laceration on the left side of Abdallah's chest. The video from the officer's body-worn camera was admitted at trial and played for the jury during the officer's testimony. Abdallah was taken to the hospital by ambulance, but he was declared dead soon after his arrival.

A medical examiner conducted an autopsy of Abdallah and found a stab wound on the left lower chest, which he determined to be the cause of death. The wound was approximately six inches deep and "three-fourths inches" wide, and it perforated the heart. The medical examiner opined that the injury was sustained from a sharp-force instrument like a knife. This stab

7

wound was fatal, and all other wounds found on Abdallah were "very superficial." Abdallah's other wounds included abrasions, blunt force injuries, bruises, scratches, and superficial cuts, some of which may have resulted from the car crash.

The medical examiner testified that the superficial cuts on Abdallah's left clavicle, head, right cheekbone, right bicep, and below the stab wound could have been caused by a sharp instrument, like a knife, or by glass. He explained that vehicle glass is tempered and designed not to shatter, and when the tempered glass does hit the body, it usually leaves dicing lacerations. Because Abdallah did not have any dicing lacerations on his body, the medical examiner opined that these injuries were more likely caused by a knife than glass. In reaching that conclusion, the medical examiner stated that he did not consider the possibility that Abdallah was dragged across broken glass when he was removed from the vehicle, but he said it would not change his opinion.

The medical examiner also used a demonstrative exhibit to show and describe how the knife would have been held and how it moved through Abdallah's body. He opined that based on the angle of the fatal wound, if the knife had been held in Lee's left hand, the sharp end of the blade would have been facing backward, toward Lee.

Police located Lee after collecting surveillance video from downtown businesses and cell phone videos from bystanders that showed Lee's car. Officers arrested Lee at his home in Ontario, California, where he had recently moved from San Diego, and conducted a search of the home. An Ontario police officer searched the bedroom closet of Lee's brother and found a black container with two folding knives. The officer moved the container to

the bed to photograph the knives. An Ontario police detective also searched the brother's bedroom, and he found three folding knives in a desk drawer.

Investigators reviewed Lee's Google search history and found that he had searched for various police codes related to vehicle accidents, assault and battery, and assault with a deadly weapon. One officer testified that these searches suggested someone was listening to a police scanner and searching for the codes as they heard them, because they did not know what the codes meant. Over the next few days, Lee also searched for information on bail bonds, San Diego police reports, whether someone can lose their job for a misdemeanor, whether cats are permitted in California jails, news reports of the incident, and other similar searches, as well as "downtown San Diego incident" and "San Diego road rage homicide." After the victim's identity was released, Lee also ran searches related to his name and obituary.

D. *The Defense Case*

The defense first called Lee's brother, who testified that he had cameras in his bedroom at the time police officers searched his house. Videos showing the search were admitted and shown to the jury. The videos were inconsistent with some of the testimony of the officers regarding the search, as they showed that the two officers searched the room together, not alone as they had testified, and they each manipulated the knives by opening them, which they had denied at trial.

Lee then testified on his own behalf. He stated that before the incident, he had never been in a fight. Because he works on cars as a hobby, he regularly carries a folding knife for mechanical work. The knife he carried at the time of the incident was a non-locking folding knife about three-and-a-half inches long.

9

On the day of the incident, Lee was heading to his apartment in San Diego, where he lived at the time, when he noticed a car tailgating him. As he approached the entry to his apartment garage, Lee put on his left turn signal and slowed down to turn into the garage. As he was making the turn, the car behind him suddenly shot out on his left side and into the oncoming traffic lane, causing Lee to slam on his brakes very hard. Everything in his car was thrown around. Lee felt "a jolt" and believed there had been a collision.

Because Lee thought his car had been hit and that the other driver, Abdallah, was "trying to run," he was upset and chased after the car. Lee tried to get Abdallah's attention by honking the horn and telling him to pull over so they could exchange insurance information. Abdallah looked in his rearview mirror and shook his head " 'no,' " which further upset Lee. Lee continued to follow Abdallah 's car and eventually pulled up next to it. While still in his car, Lee asked Abdallah, " 'Hey, what are you doing?' " Lee told Abdallah that he (Lee) had his left signal on because he had been making a turn and then asked Abdallah, "What were you thinking?" Abdallah responded, "So what. What are you going to do about it?"

At that point, Lee put his car in park and picked up his knife from the center console. Lee testified that he did not know why he took his knife with him when he got out of his car, but he thinks he was scared and did not know whether Abdallah "had anything on him," and he was just trying to intimidate Abdallah. He stated that it "wasn't really well thought out," but he absolutely did not intend to use the knife on Abdallah. Lee held the knife in his left hand with the blade facing opposite his thumb and the sharp end of the blade facing him, figuring that if he and Abdallah "were to get into a fight or something were to happen, the dull end of the blade would be less

10

impactful to [Abdallah] and, if anything, [Lee] would be the one to take most of the cuts or damage."

Lee then walked up to the driver's side window of the other car, and Abdallah "just shrugged his shoulders like he didn't care." This upset Lee, who then punched Abdallah twice in the face with his right hand. As soon as he punched Abdallah the second time, Lee realized he had "just made a mistake" and became scared, because he did not want to get into a fight. Abdallah opened his car door and Lee tried to hold the door shut with his hand and his knee to prevent Abdallah from getting out because he did not want to fight. Lee testified that at this point he was no longer angry.

Abdallah got out of his car and hit Lee, knocking Lee's glasses off. He punched Lee a total of six or seven times. Lee swung at Abdallah but was not able to hit him. Lee was only swinging with his right hand. He testified that he kept telling himself not to use his left hand, because he "didn't want to stab" Abdallah and "didn't want to do anything with the knife." He was angry that Abdallah was beating him up, but not angry enough to want to stab him.

Lee recalled that he fell to the ground after Abdallah hit him again in the face. He did not remember Abdallah shoving him, as shown in the bystander cell phone videos. When Lee fell, he was still angry and upset, but he also felt relieved because he thought it would end the fight. Lee then got up and saw a sparkly shoe. He picked it up and threw it at Abdallah, who was already walking back to his car. The knife remained in the same position in Lee's left hand during the entire interaction.

After throwing the shoe, Lee went back into his car, saw blood on his hand, and realized it was cut. Lee also saw blood on the knife, which he believed to be his own. He said he never intended to stab Abdallah, and he

11

did not believe he had stabbed him, as Abdallah seemed fine walking back to his car.

When he got home, Lee checked his car and found a scrape on the front bumper. He then listened to a police scanner app on his phone, and when he heard a police code, he would look it up to see what it was. He testified that he knew he had "just assaulted somebody" and was afraid of getting arrested and losing his job. He was not trying to determine if anyone had been stabbed when listening to the police scanner, as he did not know about the stabbing until it was reported in the news. After he heard the news reports that the man had been stabbed, crashed his car, and died, Lee was "in shock" and "pretty much freaking out." He felt terrible and considered turning himself in, but his brother advised him to get advice from an attorney first.

The attorney told Lee to "hold off for now" on turning himself in and "just wait it out," as the police would contact him. The attorney advised Lee not to "try to run." Lee tried to make it obvious he was in the process of moving from San Diego to Ontario so as not to appear like he was trying to hide. The attorney also advised Lee not to dispose of the knife. Lee had brought the knife in a bag with him to his uncle's house, so he put it on the sofa there and that was the last he saw of it. He never made any effort to relocate the knife and turn it over to the authorities.

Lee testified again that he never intended to use the knife on Abdallah and does not remember stabbing him. In his mind, he did not swing the knife at Abdallah. Lee admitted, however, that "looking at the [bystander cell phone] video, it clearly does appear that [Abdallah] was stabbed" by Lee's knife.

E. *Jury Instructions*

At the close of testimony, the prosecutor requested a modification of CALCRIM No. 510, arguing that the 2022 revision of the instruction was inconsistent with the language of section 195. Section 195 states in relevant part: "Homicide is excusable in the following cases: [¶] When committed by accident and misfortune, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent."

Former CALCRIM No. 510 provided that a defendant was not guilty of homicide if they "killed someone as a result of accident or misfortune" *and* "1. The defendant was doing a lawful act in a lawful way; [¶] 2. The defendant was acting with usual and ordinary caution; [¶] AND [¶] 3. The defendant was acting without any unlawful intent." The instruction was revised in 2022 to read: "The defendant is not guilty of [homicide] if [the defendant] killed someone: [¶] 1. By accident and misfortune; [¶] *OR* [¶] 1. If the defendant was doing a lawful act in a lawful way; [¶] 2. The defendant was acting with usual and ordinary caution; [¶] AND [¶] 3. The defendant was acting without an unlawful intent to commit [a homicide]." (CALCRIM No. 510, italics added.) The prosecutor argued that the 2022 revision contained a "drafting error," as it failed to correctly track the language of section 195, which provides that "accident or misfortune" by a defendant must be a lawful act.

The trial court denied the prosecutor's requested modification, but proposed its own modified version of CALCRIM No. 510 that would state in relevant part: "Defendant is not guilty of murder or manslaughter if, he killed someone: 1, by accident and misfortune; or, 1, if the defendant was doing a lawful act in a lawful way; and, 2, the defendant was acting with usual and ordinary caution; and, 3, the defendant was acting without an

13

unlawful intent to commit murder or manslaughter." According to the trial court, this modification would make clear to the jury that the second element ("acting with usual and ordinary caution") and third element ("acting without any unlawful intent to commit murder") would apply to either version of the first element ("accident and misfortune" *or* "doing a lawful act in a lawful way").

The prosecution agreed with this modification, but defense counsel objected. After considering further argument, the trial court ruled that it would modify CALCRIM No. 510 by adding the word "AND" before the second element and instructed the jury accordingly.

F. *Verdict and Sentencing*

The jurors deliberated for approximately eleven-and-a-half hours over more than two days. They found Lee not guilty of first degree murder but found him guilty of second degree murder. The jury also found true the allegation that Lee personally used a deadly and dangerous weapon in the commission of the murder.

After Lee's conviction, the trial court denied his motion to strike the sentencing enhancement, finding that it would not be in the interest of justice and would endanger public safety. The court sentenced him to fifteen years to life plus one year, stating: "In fact, in this case, I wish I had the ability to sentence the defendant to more than 15 years plus one day [*sic*] to life."

Lee timely filed a notice of appeal.

DISCUSSION

I

Lee first contends the trial court committed prejudicial error by admitting the video of Abdallah and his girlfriend at lunch and the body-worn camera footage of Abdallah dying in the street because the videos were

14

irrelevant and more prejudicial than probative. He further contends that the erroneous admission of the videos was prejudicial, and we must therefore reverse his conviction.

A. *Governing Law*

The admissibility of victim photographs and video "is governed by the same rules of evidence used to determine the admissibility of evidence generally: Only relevant evidence is admissible." (*People v. Lewis* (2001) 25 Cal.4th 610, 641 (*Lewis*), citing Evid. Code, §§ 350, 210.) Evidence Code section 210 defines relevant evidence as any "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." Relevant evidence "tends logically, naturally, and by reasonable inference to establish material facts such as identity, intent, or motive." (*People v. Crittenden* (1994) 9 Cal.4th 83, 132 (*Crittenden*), internal quotation marks omitted.) The trial court has broad discretion in determining the relevance of such evidence but lacks discretion to admit irrelevant evidence. (*Ibid.*)

Even if the challenged evidence is relevant, however, the trial "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352, subd. (b).) The Supreme Court has "described the 'prejudice' referred to in Evidence Code section 352 as characterizing evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues." (*Crittenden, supra*, 9 Cal.4th at p. 134.) The admission of photographs or video of a victim lies within the discretion of the trial court

15

when a claim is made that they are unduly gruesome or inflammatory, and its "discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect." (*Id.* at pp. 133–134.)

With these legal principles in mind, and having reviewed the videos in question here, we address each separately to determine whether the trial court abused its discretion in admitting them. (*People v. Thomas* (2023) 14 Cal.5th 327, 371 (*Thomas*).)

B. *Admission of the Lunch Video Was an Abuse of Discretion*

Lee argues that the trial court abused its discretion in admitting the cell phone video of Abdallah and A.K. at lunch because it was not relevant to any issue to be proved at trial. The People respond that the video was properly admitted to show Abdallah and A.K.'s demeanors and state of mind before the incident.

The Supreme Court has " 'repeatedly cautioned against the admission of photographs of murder victims while alive unless the prosecution can establish the relevance of such items.' " (*Thomas, supra*, 14 Cal.5th at pp. 371–372.) The trial court here granted the People's motion to admit the lunchtime video after finding it was relevant "to show size, demeanor, and lack of injuries" to Abdallah before the incident. We disagree, and we conclude that the trial court erred in admitting the video.

First, the video only focuses on Abdallah's face—it does not show his full body or "size"—and it is unclear in any event how his size is probative of any material fact at issue in this case. There was also no dispute that Abdallah lacked any injuries to his face before the incident. Nor was there any dispute as to which injury caused Abdallah's death. The prosecution knew the medical examiner would testify that the stab wound to Abdallah's

16

chest was the only fatal injury, and the other injuries Abdallah sustained were all superficial. Whether Abdallah had any injuries to his face before the incident was not relevant to prove any material fact at trial.

On appeal, the People focus on their argument—and the trial court's finding—that the video was relevant to show the "overall demeanor and state of mind" of Abdallah and A.K. while they were on vacation. The People contend it was necessary to undermine any argument from Lee that Abdallah was the aggressor in the fight and that Lee was simply defending himself, because the video showed Abdallah's demeanor was "relaxed—mere hours before his death—trying to enjoy himself with his new girlfriend during a fun weekend getaway in San Diego."

We are not persuaded. Even assuming Lee had relied on a self-defense theory at trial, Abdallah's demeanor hours before the incident did not have any tendency in reason to prove or disprove the theory. (See Evid. Code, § 210.) The fact that Abdallah appeared relaxed at lunch does not have any bearing on whether he may have acted aggressively toward another driver several hours later after nearly getting into a collision and being pursued by Lee. The lunchtime video simply has no probative value, and we therefore conclude that it should have been excluded.[2]

---

[2] The trial court also noted when granting the People's motion that it found the video of the couple at lunch to be "benign." We are not so sure, particularly when contrasting the lunchtime video with the video of Abdallah dying that was also shown to the jury. Even if we agreed with the trial court's characterization, however, the court does not have discretion to admit evidence that is not relevant, regardless of whether it is benign. (*Crittenden, supra*, 9 Cal.4th at p. 132.)

17

C. *Admission of the Video of Abdallah Dying Was an Abuse of Discretion*

Lee next contends that the video of Abdallah dying captured by a police officer's body-worn camera should have been excluded because it was not relevant and, even assuming relevance, its probative value was outweighed by its prejudicial impact. The People argue that the video had significant probative value because it (1) "was the best pre-autopsy visual evidence" of Abdallah's fatal stab wound and the other "slash-type" wounds on his body immediately after the crash, and (2) explained A.K.'s memory lapses relating to the incident, showing that it was a traumatic experience for her. The prosecutor further argued to the trial court that the video would help the medical examiner demonstrate the placement of the wounds at the scene and opine on how long someone with Abdallah's injuries could stay alive.

We agree with the People that the body-worn camera footage had at least some relevance, but, having viewed the video, we find that the trial court abused its discretion in finding its probative value was not substantially outweighed by its prejudicial effect. We therefore conclude that the trial court abused its discretion in admitting the post-stabbing video.

The video at issue here is disturbing, and there is no question it is likely to elicit a strong emotional response in anyone who views it. It begins as the police officer approaches the scene of a car crash, where Abdallah is lying on the ground in the street covered in blood and struggling to breathe. For five long minutes, the viewer watches as Abdallah moans, gurgles blood, and gasps for air, with his eyes rolling back in his head. His chest, stomach, arm, and face are bloody and appear to be covered in wounds, and he is bleeding from his nose and mouth. The police officer takes over from a bystander who is using clothing to apply pressure to the fatal stab wound. The stab wound is briefly visible when the officer removes the clothing to look

at it, and again when the medics arrive and take over from the officer. The responding officer repeatedly commands Abdallah to "stay with us" and "keep breathing." At the beginning and end of the video, Abdallah's girlfriend can be heard speaking to him, telling him: "Baby, you have to stay here okay, stay with me, baby"; "Baby, baby, look at me please, baby please don't roll your eyes"; and "Baby, I love you." As the People note, the viewer can also hear A.K. "crying and the strain in her voice."

In ruling on the admissibility of the video, the trial court found it was relevant to show A.K.'s demeanor and spontaneous statements, as well as the cause and manner of Abdallah's death and the significance of his injuries. We acknowledge that the post-stabbing video had at least some probative value for these purposes. Evidence of A.K.'s demeanor went to the issue of her credibility, as it tended to help explain why she provided inconsistent statements and struggled to remember specific details when recounting the events of that day. Even if the defense had not intended to impeach A.K. based on her inconsistent statements regarding the incident, the People were entitled to present evidence in their case in chief relating to the credibility of their key witness. (See Evid. Code, § 210; CALCRIM No. 226 [setting forth factors relevant to the evaluation of witness credibility, including the witness's ability to see, remember, and describe the pertinent events].) A.K.'s credibility was relevant in this case because she testified regarding Abdallah's actions immediately before and during the altercation with Lee, and it was possible defense counsel intended to argue that Lee had acted in self-defense (though he ultimately did not do so).[3]

---

[3] However, there was no dispute (or any evidence showing) that Abdallah's injuries were the result of anything other than his altercation with Lee, so we are not persuaded by the People's argument that the evidence was relevant to prove A.K. "was not involved" in the incident.

19

The video was also somewhat relevant to show Abdallah's fatal wound, although it does so only briefly, as well as other injuries on Abdallah's body. Lee argues that the video "added nothing" to the jury's understanding of the nature and cause of the injuries, as the cause of death was undisputed, and the prosecution introduced 29 autopsy photographs showing the injuries accompanied by the detailed testimony of the medical examiner who performed the autopsy. As the Supreme Court has explained, however, "the absence of a defense challenge to particular aspects of the prosecution's case or its witnesses does not render victim photographs irrelevant." (*Lewis, supra*, 25 Cal.4th at p. 641.) Moreover, the mere fact that the video or photographic "evidence may have been cumulative to other evidence does not render it inadmissible [citation], although the trial court should consider that fact when ruling on a motion to exclude evidence pursuant to Evidence Code section 352." (*People v. Gurule* (2002) 28 Cal.4th 557, 625 (*Gurule*).) And as the prosecutor argued below, the fact that Abdallah had multiple wounds that appeared to be from a knife could call into question Lee's claim that the stabbing was an accident. Abdallah's injuries and his condition just minutes after the stabbing and car crash are therefore relevant.

At the same time, however, the video "was not *strongly* probative of any disputed fact" (*Gurule, supra*, 28 Cal.4th at p. 625, italics added), and it is against this relatively low probative value that we must weigh the probability that the video's admission in its entirety would create substantial danger of undue prejudice. In *Gurule*, the Supreme Court rejected the defendant's argument that three photographs of the victim's neck wounds should have been excluded because they were cumulative of the pathologist's testimony and more prejudicial than probative. (*Ibid.*) However, the court agreed that the photographs were not strongly probative of any disputed fact,

and found that "if the photos were inordinately gruesome, [it] would be a close case on the question of whether the . . . photographs were more prejudicial than probative under Evidence Code section 352." (*Ibid.*, citing *People v. Allen* (1986) 42 Cal.3d 1222, 1257–1258 [admission of photographs cumulative to other evidence that "was itself detailed and essentially uncontested" may have been an abuse of discretion, but any error was harmless].)[4] The People are correct that victim photographs or videos in murder cases are always disturbing, and the key is therefore whether the video accurately depicts the nature of the crime without "unnecessarily play[ing] upon the emotions of the jurors." (See *People v. Ramirez* (2006) 39 Cal.4th 398, 454.) Although the video of Abdallah dying may not necessarily be "inordinately gruesome" (*Gurule, supra*, 28 Cal.4th at p. 625), we find that its probative value was "clearly outweighed" by its prejudicial effect. (*Crittenden, supra*, 9 Cal.4th at p. 134.)

As Lee argues, the video had limited probative value in part because it was cumulative of the 29 detailed and highly probative autopsy photographs that were admitted. Although the video showed the fatal stab wound, it did so only briefly. It therefore was unlikely to do much in terms of "assist[ing] the jurors in understanding and evaluating the testimony presented to them" regarding Abdallah's cause of death. (*Sims, supra*, 5 Cal.4th at p. 452.) Further, while the autopsy photographs accurately depicted Abdallah's injuries, the video was more likely to confuse or mislead the jury than help

---

4      Rather than a static photograph, the evidence at issue here is a video, which the Supreme Court has recognized has "the potential of being more graphic than is necessary to assist a jury in resolving factual issues." (*People v. Ibarra* (2007) 151 Cal.App.4th 1145, 1151, citing *People v. Sims* (1993) 5 Cal.4th 405, 452 (*Sims*).)

them understand the injuries.  (See Evid. Code, § 352.)  The video depicts Abdallah's neck, chest, and stomach as bloody and appearing to be covered in cuts, but the autopsy photographs and accompanying testimony from the medical examiner made clear that Abdallah actually had very few wounds that were likely caused by a "sharp-force object," like a knife.  Other than medical intervention wounds, no injuries appear on Abdallah's stomach or neck in the autopsy photographs.  Only two scratch-like wounds appear on his chest in addition to the fatal stab wound.  The autopsy photographs therefore present a detailed and more accurate depiction of Abdallah's injuries.

This case is unlike those cited by the People and other cases addressing the same issue, where the court found that photograph or video evidence of the victim was relevant to, for example: support the prosecution's theory of the crime (*People v. Turner* (1990) 50 Cal.3d 668, 706–707 [videotape of crime scene and condition of victim's body supported prosecution's robbery murder theory]); show express malice (*Crittenden, supra*, 9 Cal.4th at p. 134 [photographs of the locations and positions of victims' bodies, including thorough bindings made of material from defendant's home, were highly probative of premeditation and deliberation]; corroborate a witness account of the crime (*Lewis, supra*, 25 Cal.4th at p. 641 [photographs of victims' injuries and video of crime scene corroborated witness's account of the incident and supported prosecution's theories of robbery murder and burglary murder]); or help clarify potentially confusing testimony about the scene (*People v. Pride* (1992) 3 Cal.4th 195, 243).  None of these reasons for admitting otherwise prejudicial evidence applies here.

The prosecution's arguments at trial further demonstrate an intent to use the video to "evoke an emotional bias" against Lee despite the video

22

having "very little effect on the issues."  (See *Thomas, supra*, 14 Cal.5th at p. 363.)  The prosecutor argued that A.K.'s interaction with Abdallah in the video "helped show that she is nothing but a loving, comforting girlfriend," and that it was "important that the jury be able to see [A.K.]'s behavior towards the victim in that she is saying, 'Hey baby.  Keep breathing.  Stay with us.'"  The People also emphasized that the video would depict what A.K. "witnessed and endured the day of the crime as her boyfriend struggled to stay alive right in front of her" and show her "expressing how much she loves her boyfriend [as she] is patting his leg and urging him to stay."  None of this had any bearing on Lee's guilt—and exposing the jury to the same five minutes of trauma A.K. experienced as she watched her boyfriend die in the street from a stab wound that Lee inflicted is something "that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues."  (*Crittenden, supra*, 9 Cal.4th at p. 134.)

The risk that the video could evoke an emotional bias was particularly strong given the admission of the irrelevant lunchtime video of Abdallah, which shows him alive, "happy and smiling" with his girlfriend.  It is improbable that the jury would not compare the video of the happy couple on vacation celebrating their new relationship with the video of Abdallah a few hours later, bloody, moaning, and gasping for air as he lies dying in the street for five minutes, while his girlfriend cries, tells him she loves him, and begs him to stay with her.  We therefore conclude that the trial court abused its discretion by admitting the post-stabbing video of Abdallah.

D. *The Evidentiary Errors Do Not Require Reversal*

The issue of harmless error is a more difficult one.  Although we agree with Lee that the trial court erred in admitting the two videos, we

nevertheless conclude based on our review of the entire record that the error was harmless under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*Thomas, supra*, 14 Cal.5th at pp. 373–374.) " 'Under the *Watson* standard, the erroneous admission of a photograph warrants reversal of a conviction only if the appellate court concludes that it is reasonably probable the jury would have reached a different result had the photograph been excluded.' " (*Id*. at p. 374.) We apply the same standard here to the erroneous admission of the videos and find no such reasonable probability.

Both parties seem to agree that the main issue at trial was whether Lee acted with implied malice in using the knife during the fight with Abdallah or whether the stabbing resulted from an accident. (See *Gurule, supra*, 28 Cal.4th at pp. 625–626 [finding that the "only real issue" turned on whether the jury believed the defendant or a witness, and admission of victim photographs were therefore harmless even if in error].) The jury found Lee guilty of second degree murder, therefore necessarily concluding that Lee acted with malice but not willfully, deliberately, and with premeditation. (See CALCRIM Nos. 520, 521.)

Evidence and testimony provided compelling support for a jury finding of implied malice. The court instructed the jury that for the People to establish Lee acted with implied malice when he caused Abdallah's death, they were required to prove: (1) Lee intentionally committed the act; (2) the natural and probable consequences of the act were dangerous to human life; (3) at the time he acted, he knew his act was dangerous to human life; and (4) he deliberately acted with conscious disregard for human life. (CALCRIM No. 520; *People v. Reyes* (2023) 14 Cal.5th 981, 988.) A.K. testified that Lee acted aggressively and started the fight with Abdallah. Lee tailgated the couple's car and then, after pulling up next to them, walked up and punched

Abdallah in the face multiple times through his driver window while armed with a knife. According to A.K., Abdallah remained calm throughout the incident until he was punched in the face. Lee admitted he approached Abdallah's car and punched him twice, testifying that he was angry because he thought Abdallah was "trying to run" after hitting Lee's car. After parking his car and getting out to "exchange information" with Abdallah, Lee admitted he took his folding knife with him to attempt to "intimidate" Abdallah. Lee further testified that he knows knives are dangerous and can kill people, and he intentionally positioned the blade in a certain way as he held it because he knew someone might get hurt during the fight.

Despite this knowledge and having time to consider his actions before getting out of his car, Lee made the conscious choice to open the blade of his knife before walking over to Abdallah's car to initiate a fight by punching him in the face. He admitted that he kept the knife in his hand, blade exposed, during the entire fistfight with Abdallah. The cell phone videos taken of the fight show Lee putting his left arm and hand up towards Abdallah more than once, and Lee admitted that he held both fists up in the air in a fighting posture while the blade of the knife was sticking out from his fist. He also never retreated from the fight.

Lee also admitted that he never warned Abdallah that he had a knife or threatened him with it, and the videos of the fight filmed by witnesses do not show Lee displaying the knife until after the fight was over, if at all. None of the witnesses even realized Lee had a knife in his hand at the time, and it appears Abdallah was not aware of the knife either. This evidence undermines Lee's claim that he only intended to display the knife to intimidate Abdallah. Moreover, the medical examiner testified that there

25

were multiple slash-type wounds on Abdallah's body likely caused by a knife, which tended to undermine Lee's claim that the stabbing was accidental.

We also note that the prosecutor only showed the videos one time each during her case in chief (before Lee testified in his own defense) and then did not reference them again during the trial, including in her closing argument. Moreover, nothing in the record suggests that the jury was focused on the videos in deliberations. On the contrary, the jury asked for readback of Lee's trial testimony, suggesting it was focused on assessing his version of events. Thus, the videos "were not central to the prosecution's case or the jury's ultimate determination of the issues." (*Thomas, supra*, 14 Cal.5th at p. 374.) Based on our own experience viewing the videos, their immediate emotional impact dissipates over time with exposure to other evidence and arguments. Considering the totality of the record, including Lee's own admissions, there is no reasonable probability that without the admission of these videos, any juror would have voted to acquit him based on the jury instructions given on perfect self-defense and excusable homicide.

We also conclude there is no reasonable probability the jury would have found Lee guilty only of one of the lesser included offenses on which it was instructed. Because Lee was the aggressor who approached Abdallah with an open knife in his hand before throwing the first punch, no reasonable juror could have found sufficient provocation for a heat of passion theory of voluntary manslaughter. (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 83 [insufficient evidence of provocation in road rage killing committed after victim cut off appellant's vehicle].) "A defendant may not provoke a fight, become the aggressor, and, without first seeking to withdraw from the conflict, kill an adversary and expect to reduce the crime to manslaughter by merely asserting that it was accomplished upon a sudden quarrel or in the

heat of passion." (*Ibid*.)  There was also no evidence to support an imperfect self-defense theory of voluntary manslaughter.  (See *People v. Flannel* (1979) 25 Cal.3d 668, 679–682.)  Finally, based on Lee's own admissions that he was aware of the risk to human life and was consciously trying to avoid stabbing Abdallah during the fight, no reasonable juror could have concluded that Lee acted "without conscious disregard of the risk to human life" as required by the involuntary manslaughter instruction given at trial.  (CALCRIM No. 580.)  After considerable reflection, we therefore conclude that the improper admission of the videos constitutes harmless error.

II

Lee next contends that the trial court erred by modifying CALCRIM No. 510 to add the word "AND" before element two such that it read as follows: "The defendant is not guilty of murder or manslaughter if, he killed someone: [¶] 1. By accident and misfortune; [¶] OR [¶] 1. If the defendant was doing a lawful act in a lawful way; [¶] AND [¶] 2. The defendant was acting with usual and ordinary caution; [¶] AND [¶] 3. The defendant was acting without an unlawful intent to commit murder or manslaughter. [¶] A person acts with usual and ordinary caution if he or she acts in a way that a reasonably careful person would act in the same or similar situation. [¶] The People have the burden of proving beyond a reasonable doubt that the killing was not excused.  If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter."  According to Lee, because there is no authority to suggest that CALCRIM No. 510 as revised in 2022 is incorrect, and the revision is consistent with a reasonable interpretation of section 195, the trial court's modification of the instruction was error.

The People argued below that the revision of CALCRIM No. 510 is inconsistent with section 195, and they argue on appeal that Lee's argument

27

must fail because he has not demonstrated that the trial court's modification of CALCRIM No. 510 was inconsistent with the statute. They also argue there is no reasonable likelihood the jury was misled by the modified instruction and, even assuming error, it was harmless beyond a reasonable doubt.

Section 195 states in relevant part: "Homicide is excusable in the following cases: [¶] When committed by accident and misfortune, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent." Lee argues that the Legislature's use of the word "or" indicates its intent that the "accident and misfortune" phrase act as an alternative to the second phrase (a lawful act, done with ordinary caution and without unlawful intent), because an "accident" occurs unintentionally by definition, but a "lawful act" can occur with lawful or unlawful intent. According to Lee, to find that a homicide was committed by accident and misfortune, a jury need not also find that the defendant acted with usual and ordinary caution and without any unlawful intent. Lee contends that the instruction as given improperly added an element to his accident defense, because even if the jury found the stabbing was accidental, the revised instruction required the jury to also find that Lee's conduct in holding the knife was "done with ordinary caution" for the defense to apply.

We conclude that the modified instruction given by the trial court was not prejudicially erroneous. In *People v. Velez* (1983) 144 Cal.App.3d 558, 567 (*Velez*), the Court of Appeal rejected a similar argument from the defendant, who contended that the trial court erred in instructing the jury that a "homicide is excusable if the defendant acted as would a 'careful and prudent individual under like circumstances.'" The defendant argued that the instruction was misleading and confusing because "it could tempt the jury to

28

return a guilty verdict on the basis of a showing of mere civil negligence." (*Id.* at p. 567.) The court disagreed, concluding that because the jury was also "instructed correctly as to the prosecutor's burden of proving criminal negligence" as an element of the charged crime, the instructions when "read together" correctly stated the law and "instructed the jury properly as to the prosecutor's burden of proof."[5] (*Id.* at pp. 567–568.) Here, the trial court correctly instructed the jury on the higher mental state required for second degree murder (express or implied malice). We therefore conclude there was no error.

Even assuming the trial court erred in modifying CALCRIM No. 510, we find the error to be harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). (See *Neder v. United States* (1999) 527 U.S. 1, 15 [instructional error that omits an element of an offense is a constitutional error subject to *Chapman* harmless error analysis].) The California Supreme Court has explained that "[g]enerally, the claim that a homicide was committed through misfortune or by accident 'amounts to a claim that the defendant acted without forming the mental state necessary to make his or her actions a crime.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 674 (*Jennings*).) In other words, it is not a true defense but rather a way to negate the intent element of the alleged crime. (*Id.* at pp. 674–675 [explaining that a claim of accident in response to a charge of murder "is not an affirmative defense" and finding that the defendant's claim of accident amounted to a claim that the defendant lacked the necessary intent to prove first degree premeditated murder]; see also *People v. Anderson* (2011) 51

___

[5] The court in *Velez* also suggested that any error would be harmless by citing authority "holding that even the giving of erroneous instructions may be remedied by other correct instructions." (*Velez, supra,* 144 Cal.App.3d at p. 568.)

Cal.4th 989, 997–998 ["California cases that have discussed the 'defense' of accident" support the view that it is raised by defendants to "rebut the mental element of the crime."].)

Here, by convicting Lee of second degree murder rather than manslaughter, the jury necessarily found that he acted with express or implied malice and thus rejected his claim that he acted without forming the mental state necessary to make his actions a crime. (See *Jennings, supra*, 50 Cal.4th at p. 674.) Based on this finding, there is no reasonable probability the jury would have determined Lee acted with due care under either an ordinary negligence standard or a criminal negligence standard. We therefore conclude that even if the trial court's instruction was in error, it was harmless beyond a reasonable doubt.

DISPOSITION

The judgment is affirmed.

BUCHANAN, J.

WE CONCUR:


McCONNELL, P. J.


DATO, J.

30